Mel Marin                          July 31, 2019
Box 401
Getzville, NY 14068

Plaintiff
*Pro Se*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| MEL MARIN, | ) | 5:19-cv-5057 |
| | ) | COMPLAINT FOR FRAUD |
| Plaintiff, | ) | AND FOR VIOLATION OF |
| | ) | THE CALIFORNIA UCL |
| v. | ) | AND FOR RESCISSION |
| | ) | AND FOR CONVERSION |
| WELLS FARGO, N/A, | ) | AND FOR EMOTIONAL |
| CLEAR RECON, | ) | DISTRESS |
| | ) | |
| Defendant. | ) | JURY DEMANDED |

Plaintiff alleges this:

## PRELIMINARY STATEMENT

1. Plaintiff comes here to prosecute his own state law claims for sale

rescission, conversion, and personal injury against the defendants, and as the

assignee of causes of action belonging originally to plaintiff's sister, the

contracting party, for mortgage loan fraud, for violations of the California Unfair

Competition Law, and for relief under the Truth In Lending Act, 15 U.S.C. § 1601

1

(hereafter "the Act"), for rescission of a consumer credit transaction, and to void the defendant's security interest in the subject property if it were ever valid, and to recover statutory damages, reasonable attorney's fees and costs by reason of the defendant's violations of the Act and Regulation Z, 12 C.F.R. § 226.

## JURISDICTION

2.  This court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 based on 15 U.S.C. § 1601, and for declaratory judgment based on 28 U.S.C. § 2201, and additional supplemental jurisdiction over plaintiff's state law  claims pursuant to 28 U.S.C. §1367.

3.  This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and plaintiff is domiciled in New York while the domicile of Wells Fargo (hereafter "WELLS") is South Dakota, as determined by Morales v.  Wells Fargo Bank, NA, 845 F. Supp. 2d 1034, 1061 (C.D. Cal. 2012)("the court concludes that Wells Fargo is a citizen only of South Dakota, not California"), and the domicile of CLEAR RECON is Delaware.

4.  The mortgage agreement and deed of trust at issue were created on about July 26 and July 30, 2007.

5.  Relevant statutes of limitation are not a concern here for two reasons.

6. First, the lender expressly agreed to waive resort to the defense of statutes of limitation at ¶ 21 of the deed of trust which created a judicial estoppel barring that defense from being considered by this court as to any claims arising from these loan agreements:

> **WAIVER OF STATUTE OF LIMITATIONS**
> **I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Agreement, including any obligations referred to in this Security Agreement of Secured Notes.**

DEED OF TRUST, San Diego County Recorder 2007-0524636, ¶ 21, p. 10980

(Dexter v. Pierson,  214 Cal. 247, 250-251 (1931) (mortgagor and lender may expressly waive the statutes of limitation defense in their mortgage contracts)).

7. WELLS has also asserted elsewhere that there is a different junior deed of trust for a credit line for the same property with deed terms that are not entirely the same. However, under California law, both deeds are treated as one and claims under the credit line are extinguished where the bank attempts a sale:

> [W]hen the same party holds separate deeds of trust on the same real property and forecloses under the senior deed of trust's power of sale, thereby eliminating the security for its junior deed of trust, the two secured obligations are treated as one. Thus, section 580d bars recovery of any balance owing on the obligation secured by the junior deed of trust.

Evans v. California Trailer Court, Inc., 28 Cal. App. 4th 540, 561 (1994).

8. This express waiver applied not only to the state law claims arising from the mortgage agreement, but also to related claims under federal statutes as tolling,

3

according to <u>Kerby v. Mortgage Funding Corp</u>, 992 F.Supp. 787, 792 [2], [3], 795

(D. Md. 1998)(waivers by the gov't are strictly construed but waivers of statutes

of limitation by private parties over RESPA and TILA are liberally construed so

equitable tolling is available).

9.  Second, even if the waiver of limitations were not valid for any reason,

the prosecution of the rights asserted herein was also subsequently extended

because of the filing of Title 11 actions in the United States Bankruptcy Court for

the Southern District of California for the period October 26, 2010 with the filing

of action <u>In re Bauman</u>, 10-18930 (Bankr. S.D. Cal. 2010) to May 2019 after the

order lifting the bankruptcy stay in <u>In re Bauman</u>, 18-02875 (Bank. S.D. Cal.

2018), because until that order lifting the stay, the rights to rescind and to act on

any causes of action were exclusively under the possession and control of the

Bankruptcy Trustee and that officer refused to agree to sister's written request to

lift the stay before May 2018 so that sister could prosecute these claims, tolling the

running of any limitations periods under the rule in (<u>In re Merrick,</u> 175 B.R. 333,

336 (B.A.P. 9th Cir. 1994) (only the trustee may take offensive action on a

debtor's claim without approval of the court because "a debtor's lawsuit

constitutes a chose in action that is property of the estate"); <u>Lane v. Vitek Real

Estate Industries Group</u>, 713 F. Supp. 2d 1092, 1097 (E.D. Cal. 2010) (borrower

has no standing to sue because "a bankruptcy petitioner loses standing for any

causes of action and the estate becomes the only real party in interest unless the

bankruptcy trustee abandons the claims"); In re Corbett, Adv. No. 14-01089

(Bankr. E.D. Cal.  March 14, 2016)-A ("personal-injury causes of action **are**

**property of the estate**" so debtor may not pursue her own claims for personal

injury); Moralez v. Vilsack, No. 1:16-cv-282, 2017 U.S. Dist. LEXIS 201974 at *6

[2] (E.D. Cal. Dec. 6, 2017)(plaintiff's argument that she has a right to sue without

bankruptcy court approval because she is a debtor, fails,  since **she cannot file a**

**suit on her own behalf for her crop loss** while in bankruptcy because once she

files bankruptcy "she no longer possesses an interest in that claim"); Kertesz v.

Ostrovsky, 115 Cal.App.4th 369, 378 (4th Dist. 2004)(San Diego Court of

Appeal)(trial court erred in granting demurrer and failing to toll the time the

plaintiff's prior action was in bankruptcy court, and should have allowed the new

filing after a 10 year delay because of the bankruptcy);  Schumacher v. Worcester,

55 Cal.App.4th 376, 380 (1997)(all statutes of limitation were tolled during the

period of the automatic stay in bankruptcy proceedings and that time should not be

counted for limitation purposes and is time taken out" of the running); Canterbury

v. J.P. Morgan Acquisition Corp., 958 F.Supp. 2d 638, 649 (W.D. Va., 2013)

(TILA right of rescission is property of the estate as personal property or cause of

action once a Chapter 7 bankruptcy action has been filed, and can only be

exercised by the bankruptcy trustee, citing 3rd, 4th and 7th Circuits, so the debtor

has no standing); <u>Lausier v. Goodwin</u>, 7 B.R. 476, 478 at [2]  (Bankr. D. Maine

1980)(on entry of the Chapter 7 order, "the debtor's right of rescission became

property of the estate . . exercisable exclusively by the trustee in bankruptcy).

10.  Sister would have been first alerted to the possibility of fraud in mid-

2011 after WELLS refused to accept tenders of payments and also refused to

respond to her requests for reasons for the refusals.    From mid-2011 to the

present, the only times the automatic bankruptcy stay was not in force was from

7/28/15 when action 11-11223 was dismissed to 1/25/16 when action 16-301 was

filed, and after May 26, 2018 when the bankruptcy judge lifted the stay.   The total

time that statutes statute of  limitations was not stopped, therefore, was at most 5

months in 2015 and 15 months since May 2018.   Because that is less than 3 years

for the deadline for a fraud claim, this action is timely.

11.  Additionally, California substantive law imposes the rule that if one

claim is timely under the longest statute of limitations, it protects all other claims

in the  same law suit, according to <u>Pugliese v. Superior Court</u>, 146 Cal.App.4th

1444, 1453, 53 Cal.Rptr.3d 681, 687 (2007)(a claim filed under a short deadline to

sue is automatically extended to equal the longest time available in any other

cause of action against the same defendants or their co-conspirators so that all of

the injuries may be considered a "continuous whole" injury and the time within

which to sue does not start until the widest period allowed for all of the claims).

12.  Therefore, all of the causes of action asserted herein are timely.

## PARTIES

13.  Plaintiff is a natural person and an assignee of his sister's causes of action for claims herein, and a part owner of same property by lien, and by formal assignments dated June 1, 2018 to this plaintiff.

14.  WELLS is a corporation licensed by this state and conducts consumer creditor transactions of the type at issue here.

15.  RECON is incorporated in Delaware and is a Delaware citizen.

## I.

## FIRST  CAUSE  OF  ACTION  FOR   FRAUD

16.  A cause of action for a tort as to property in California is assignable and, because sister assigned this claim to brother after the bankruptcy court lifted the stay in May 2018, brother has standing to prosecute this claim of his sister's. CAL. CODE CIV.  PROC. §954; Murphy v. Allstate Ins. Co., 17 Cal.3d 937, 946 553 P. 2d 584 ("causes of action for tort committed to property are assignable"); Goodley v. Wank & Wank, Inc., 62 Cal. App. 3d 389, 394 (1976)("Assignable are choses in action arising out of an obligation or breach of contract[8] as are those arising out of the violation of a right of property (§ 954, Civ. Code) or a wrong involving injury to personal or real property.[9]").

7

17.  The deadline to file a fraud action is three years from discovery.  CAL. CODE OF CIV. PROC. §338(d).

18.  Sister Jordana Bauman executed mortgage loan agreements on about July  26, 2007 at about 2pm and on July 30, 2007 at about 4pm, at San Diego, California, to borrow money from World Savings Bank FSB which was intended by the parties to be secured by a deed of trust against the property at Unit 12, 2410 Albatross St., San Diego, California 92101, under terms set forth in writing and orally, and an except of written duties is set forth in the deed of trust attached hereto, and which were supposed to be funded after execution of this deed evidencing secured loans.   World represented it had the power or desire to execute the loan documents and fund the loan

**Failure  Of  World  To  Fund  The  Loan**

19.  However, although the debtor executed the loan agreement(s) in good faith, the loan was never funded.   This was because, sister was dealing with an established bank and had no way of knowing  World Savings was unable to fund new loans because of violations of federal lending laws involving other borrowers that effectively "froze" their ability to do lending business in 2007 and placed the bank under the direct control of the United States before the deed of trust was executed.   Had sister known this she would not have signed any deed of trust.

20.   The bank knew at the time they could not and would not fund the loans described above because they had no power to pay loan money agreed-to, but continued to represent that they would fund the loans and continued to elicit cooperation by plaintiff's sister in executing the security agreements in the hope of inducing plaintiff into signing the deed and encumbering plaintiff's property and deceitfully generating monthly payments for the loans from sister to "pad" the balance sheets of the bank to give the impression of better financial health than the bank could lawfully represent.

21.   Because World did not advertise this deceitful scheme there was no way sister could have known that she was being "railroaded" into giving up her home and her money by signing the deed of trust.   Plaintiff then made monthly mortgage payments while waiting for the loan money to be paid to her, resulting in draining of her personal savings and losing the ability to pay dues and costs for her condominium home which the loans in part, were supposed to pay.

22.   By directive of the federal government, World Savings ceased to exist and their contracts and duties were taken over by Wachovia Bank who also failed to fund the loans while plaintiff kept paying monthly.

23.   Wachovia was also frozen for similar unlawful banking practices as World, culminating on about November  1, 2009 by a "take-over" by WELLS.

24.   As the acquiring bank, under state and federal laws WELLS took upon

itself the assets and liabilities of the acquired entities World and Wachovia, including a liability for all legal claims against World and Wachovia.

### Wells Also Failed To Fund And Continued The Bluff

25.  Like Wachovia, WELLS refused to execute the burden of funding the loans at issue here and sought only to take the benefits of monthly payments.

26.  The failure and refusal of WELLS to make good on the loan agreement by failing to fund it constituted a breach of the covenant of good faith, and the banks' intentional misleading of sister from the time she signed the deed of trust and commenced making payments when the lenders knew they would never actually fund the loans, was a deliberate deceit.

27.  Sister did not know the banks would never find the loans and begin to suspect fraud until Wells refused to accept any more monthly mortgage payments on May 11, 2011, and refused to explain why after sister made written and phone inquiries.   WELLS also refused to refund any of the approximately $20,000 in monthly payments she made, keeping all of it.  And WELLS spent the next 8 years giving notice of default, and advertising foreclosure sales to the public, reporting that sister failed to make monthly mortgage payments after May 2011, and forcing sister to file bankruptcy to stop foreclosure in 2011 after sister had already filed a bankruptcy in 2010 to stop the condo association from threatening her, until

WELLS and its conspiring trustor CLEAR RECON failed to inform brother of their sale plan and executed a *purported* sale on about March 4, 2019 to WELLS, the defendant here.

28.  In other words, the lenders never funded the loans, but used the deed of trust sister signed in good faith, to support their unlawful seizure of her home.  It was a "bluff", a fraud on sister and on the public.

29.  The damage from this long-range scheme was this:

(a)  It prevented sister from paying monthly condominium fees for years, resulting in the condominium association suing sister for over $50,000 in late fees and penalties and threatening foreclosure of her property, disconnecting utilities to chase her out, and stealing and discarding her mail to punish her.

(b)  It prevented sister from improving and selling the same property at Albatross St. to continue her real estate business which could have generated at least $70,000 a year in income for the period 2008 to 2018, creating an "opportunity cost" or loss, of $700,000.  Meyer v. Sprint Spectrum LP (2009) 45 Cal. 4th 634, 640 n. 1 [200 P. 3d 295] (lost opportunity cost as other uses foregone is a proper method of assessing damages claimed).

( c )  It caused the loss of sister's property at 1132 Archer St. in San Diego because she could not continue making mortgage payments on that home, at a loss of $2.2 million.

(d)  It caused the *sham* sale of the property at Albatross on March 4, 2019, denying plaintiff the $365,000 estimated sales price of the condominium.

(e)  It caused sister severe emotional distress and personal injuries like stroke, coma, and internal injuries caused by stress, because of the threats of law suits and legal actions taken by the condominium group, and because of multiple threats of foreclosure by WELLS when WELLS knew it had no right to claim default and no right to foreclose, and no right to create the stress and injuries visited upon sister.

30.  It was the actual, or proximate cause of these losses.

31.  Moreover, records supplied by the defendant to sister during some of this litigation over the past 8 years prove that Wells knew or should have known that they had no right from the beginning to bluff, and had no right to continue their "bluff" after 2016 because internal bank records dated in March 2016 admitted that the loans at issue were "never worked" and that there was no record anywhere of any check being issued for anything.

32.  WELLS knew therefore, after their internal investigation in 2016 that it was executing a bluff against sister and against the public by reporting falsely that sister failed to make mortgage payments to repay a loan that was never made, and WELLS knew it was causing stress and anxiety to sister, and knew that stress was creating medical problems but intentionally continued those false reports and

threats of foreclosure in an effort to cause the stroke that crippled sister, to kill

sister to get her out of the way so the bank could seize her home without delay.

33.  This conduct proves deliberate and severe malice that is unconscionable

in civil society.

34.  Although other problems of sister like unrelated health difficulties may

have been an additional cause of sister's inability to continue her real estate

business during these years, a jury is still entitled to make an award of damages

against WELLS based on the conduct of any of the lenders named here because

WELLS is fully responsible for the conduct of all 3 lenders if the jury agrees that

the conduct of any of them was still a *substantial cause* of the economic losses of

sister, under the rule in <u>Scirex Corp. v. Federal Ins. Co.</u>, 313 F.3d 841,  849-50 (3d

Cir. 2002) (the direct cause of a loss "does not have to be the sole cause or

immediate cause" of plaintiff's loss for him to prevail, "but need only be a

proximate or substantial cause" of the loss to allow a damages award).

35.  Under California law, a jury is entitled to award damages for fraud from

allegations and a preponderance of evidence that shows, (1) World misrepresented

it had the power or desire to execute the loan documents and fund the loan

knowing that representation was false (CAL. CIVIL CODE §§ 1572, 1710), and

(2) that was a fact misrepresentation material to the agreement and important

enough that a party would not have executed the contract if they had known the

truth (<u>Roddenberry v. Roddenberry</u>, 44 Cal. App. 4th 634, 665 (1996).), and (3) where the misrepresenting party knew or should have known their representation was false (<u>Cicone v. URS Corp.</u>, 183 Cal. App. 3d 194 (1986)), and (4) intending to induce the innocent party to rely on the misrepresentation (CAL. CIVIL CODE § 1572), and (5) where the innocent borrower justifiably relied on the belief that the bank's conduct would be fair in the transaction (<u>Lovejoy v. AT&T Corp.</u>, 92 Cal. App. 4th 1016 (2001)), and (6) where the misrepresentation was an actual, proximate or substantial cause of harm to the borrower (<u>Nagy v. Nagy</u>, 210 Cal. App. 3d 1262, 1268 (1989).).

36. Each of these elements is met here.  Element (1) is alleged above at ¶¶18.  Element (2) is alleged at ¶19.  Element (3) is alleged at ¶ 20.  Element (4) is alleged at ¶ 20.   Element (5) is alleged at ¶ 5.   Element (6) is alleged at ¶ 30.

37. WHEREFORE, as an assignee of his sister's claims which she cannot fairly pursue in this court because of poverty and crippling physical injuries created by WELLS by the stress of 8 years of bankruptcy litigation, brother seeks and is entitled to $3 million in actual and consequential damages related to sister's *economic* losses from her real property.

38. Brother is not allowed to seek damages based on physical injuries to sister because physical injury claims may not be assigned under California law.

39. However, WELLS and its "side-kick" and co-conspirator RECON

demonstrated malice by continuing to press for foreclosure after the 2016 internal

investigation of the bank proved they had no such power.   Therefore, as assignee

for his sister brother seeks and is entitled to another $10.9 *billion* in exemplary or

punitive damages based on 1% of the net worth of WELLS as one of the largest

banks in the world with $1.9 trillion in assets according to Bankrate.com as of

May 30, 2019, and from www.macrotrends.net/stocks/charts/WFC/wells-fargo/

net-worth, and this is an amount that a jury may lawfully award – and California

courts have ruled a punitive claim of as high as  17% of the net worth of the

offending corporation is not excessive regardless of actual losses to the person

harmed, because the purpose of punitive damages is not to compensate for actual

losses, but to discourage rich companies from continuing their wrongful conduct

against innocent borrowers, as in Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.,

155 Cal. App. 3d 381, 391 (1984)("Net worth generally is considered the best

measure of a defendant's "wealth" for purposes of assessing punitive damages . . ..

Although the award, representing 17.5 percent of Kearny Mesa's annualized net

worth or almost 4 months net profit, is somewhat greater than comparable ratios

contained in the reported cases (see appendix), we cannot say these numerical

differences mandate a finding of excessiveness".)  [San Diego Court of Appeal];

Ward v. Taggart, 51 California Supreme Court 2d 736, 743 (1959)("Courts award

exemplary damages to discourage oppression, fraud, or malice by punishing the

wrongdoer. (See McCormick, Damages, 79; Morris, Punitive Damages in Tort

Cases, 44 Harv.L.Rev. 1173, 1185-1188.) [15] Such damages are appropriate in

cases like the present one, where restitution would have little or no deterrent

effect, for wrongdoers would run no risk of liability to their victims beyond that of

returning what they wrongfully obtained.").

## II.

### SECOND   CAUSE   OF   ACTION   FOR

### VIOLATION  OF  THE  CALIFORNIA  UNFAIR  COMPETITION  LAW

40. The allegations above are incorporated into this claim by this reference.

41. A business violates the California Unfair Competition Law when it

does any unfair or fraudulent act even if it is not in competition with the person

suing them:

> Unfair competition shall mean and include any unlawful,
> unfair *or* fraudulent business act or practice, and unfair,
> deceptive, untrue or misleading advertisement.

California Business And Professions Code Section 17200.

42. As part of this "bluff" by this bank from the period 2011 to 2018,

WELLS repeatedly and intentionally reported to credit bureaus that sister missed

monthly mortgage payments knowing sister was not in default, designated sister as

"in default", and advertised the property for foreclosure sale, to give the

impression to the public that the bank had a legitimate right to mortgage payments and sale.

43.  The dates of these reports to the Equifax credit agency and to real estate marketing firms to sell the property include, but are not limited to on about June 10, 2011, July 10, 2011, October 10, 2012, November 10, 2012, December 10, 2012, September 10, 2015, October 10, 2015, November 10, 2015, December 10, 2015, September 10, 2017, March 10, 2018.

44.  The dates of reports to real estate marketing firms and public media by newspaper (through the San Diego Union) and internet, representing falsely that the bank had the right to sell, were on about January 1, 2013, February 1, 2013, January 11, 2016,  October 1, 2017, and April 15, 2018.

45.  However, the bank had no such right to report failures to make monthly payments and to report that they had a right to sell, and did so knowing they had no such right.

46.  This is because the loan was never funded and, therefore, there was no consideration by the lender to gain the right to monthly payments, nor the right to foreclose under the deed of trust, according to California law at CIV.  CODE §1550 and as held by Holcomb v. Long Beach Investment Co , 129 Cal.App. 285, 292 at [4](1933)(A contract not supported by consideration is an instrument *nudum pactum*, or void and unenforceable) and In re Amica Inc., 135 B.R. 534,

(Bankr. N.D. Ill. 1992)(failure to pay money agreed is a failure of consideration)

and <u>Richter v. Union Land and Stock</u>, 129 Cal. 367, 372 (1900)(failure of one

party to perform the contract constitutes a failure of consideration).

47.  The bank also had no right to represent that it had the power to report

missed payments even *if* the mortgage agreement were valid, because the bank

itself refused to accept continued tenders of payments and that extinguished any

right of the bank to take any action as to that property *if* it ever had that right, as in

<u>Triad Data Services, Inc. v. Jackson</u>, 153 Cal.App.3d Supp. 1, 9 (1984)(the

refusing party has no standing to claim failure to pay the debt for the entire time

"during which he so avoids payment") and <u>Horizon Textiles, Inc. v. Pandelco,</u>

<u>Inc.</u>, B226867, at E (Cal. Ct. App.  Dec. 20, 2012 )(the first party to fail to

complete a essential element of the contract is estopped from claiming that the

responding party breached its contract by failing to perform subsequent essential

terms).

48.  And the bank also had no right to report failures to pay while sister was

a debtor in bankruptcy because in the bankruptcy the property and all rights and

duties belonged to the bankruptcy trustee and the debtor had no duty to pay

anything.

49.  Therefore, WELLS committed the unfair business practice of

misleading the public by furnishing to a consumer reporting agency information

that it knew was false. This was violation of the California's Consumer Credit Reporting Agencies Act (CCRAA), which provides that "`[a] person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate.'" CAL. CIVIL CODE Section 1785.25 (a).

50. A violation of *any* California statute provides the basis for a cause of action under the California Business And Professions Code Section 17200, according to <u>Chabner v. United of Omaha Life Ins. Co.</u>, 225 F. 3d 1042, 1048 (9th Cir. 2000) in support ("the district court was correct in holding that Chabner could maintain a cause of action under section 17200 for United's alleged violation of section 10144").

51. Additionally, the bank's advertising of the property for foreclosure sale to the public, to give the impression to the public that the bank had a right to sell was a misleading advertising and constituted a "fraud on the public" under common law, which provides a separate basis for a cause of action under the California Unfair Competition Law which is set out in the California Business And Professions Code Section 17200. <u>Bank of the West v. Superior Court</u>, 2 Cal.4th 1254, 1262, 833 P. 2d 545 (1992) ("an act that is deceptive and in effect a fraud on the public or that otherwise violates the legal and equitable rights of a competitor or the public.").

52.  WELLS also violated this state law by continuing the fraudulent

scheme of its acquired lenders World and Wachovia for which these lenders were

sued on information and belief, by several states for refusing to fund loans and

then  declaring borrowers in default for failing to pay on those unfunded loans.

The proof that WELLS was well aware of this illegal scheme of those acquired

lenders World and Wachovia was that by late 2010 WELLS had acknowledged the

illegal  practices of World and Wachovia in settlement agreements to pay

hundreds of  millions of dollars to shorten law suits with regulators in Arizona,

Colorado, Florida, Illinois, Nevada, Texas and Washington.

53.  Sister was forced to file bankruptcy after bankruptcy for years to

prevent WELLS from trying to sell because with her disabilities a sale and

eviction would mean death.

54.  The bank's refusal to stop this "bluff" after its own internal

investigation admitted on March 8, 2016 at 8:11am in a FAX transmission by

WELLS staffer Willie C. Johnson, at Wells Fargo Home Lending at 1 Home

Campus, Des Moines, Iowa, that the loan WELLS seeks to foreclose against was

never funded, proves that the bank knew its representations to the public were

misleading and intended them to be misleading.

55.  This repeated misleading advertising and reports to credit bureaus was

an actual or proximate cause of the harm visited upon sister described above at

¶29.

56.  The allegations at ¶ 31 show the advertisements and reports to credit

bureaus and to others in the public by WELLS that plaintiff was in default, and

failed to pay mortgage payments in 2017 or any prior year since 2011, were false.

57.  And it is not necessary to show the injury visited upon plaintiff was

directly caused by the misleading business practice of WELLS, according to

Saunders v. Superior Court, 27 Cal.App.4th 832, 839 (1994) (this law does not

require that a plaintiff prove she was directly injured by the unfair business

practice; only that the practice hurt the plaintiff in some way or could injure the

public).

58.  Plaintiff has shown at ¶¶ 30-31 above that the misleading of WELLS

was  directly or indirectly the cause of her inability to complete loan contracts and

to continue her business, and to avoid more serious medical problems.

59.  Under this California Act, exemplary damages and punitive damages

are *not*  available as they are under the state fraud action, and a plaintiff is only

entitled to "restoration" damages, or the amount to compensate for personal or real

property actually lost because of acts by the bank, according to Korea Supply Co.

v. Lockheed Martin Corp., 29 Cal.4th 1134, 63 P. 3d 937 (2003).

60.  WHEREFORE, brother seeks and is entitled to an award of restitution

against WELLS that would restore to brother the losses of his sister of personal

and real property, which includes $2.2 million for the lost Archer St. house, plus

her right to continue her real estate business which WELLS took from her for nine

(9) years or $2.8 million, plus $375,000 for the value of the condo that the bank

has reported to have sold on about March 4, 2019.

## III.

## THIRD  CAUSE  OF  ACTION  FOR  RESCISSION
## UNDER  THE  TRUTH  IN  LENDING  ACT

61.  The allegations above are incorporated into this claim by this reference.

62.  The loan transactions described above were entered into as consumer

credit transactions with the lender World in which any credit extended was subject

to a finance charge payable to World Savings and later to Wachovia and then to

WELLS.

63.  Two credit agreements were actualy contemplated, one for an initial

mortgage and the other for future advances as an "equity line of credit".

64.  Both deeds of trust that memorialize the credit agreements under a

separate agreement, were governed by the latter deed of trust filed and recorded in

the San Diego County Office of the Recorder in December 2007, and a copy of

that credit agreement that was filed by World Savings is attached hereto.

65.  Brother does not represent that the attached is a true and correct copy of

the final agreement; only that the attached copy is the one supplied by WELLS

which WELLS admitted to California courts to be the final governing agreement.

Therefore, WELLS is bound by ¶21 of the deed that states statutes of limitation are

waived, under the rule in Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988)

(admissions by party attorney constitute admissions by the client).

66.  As part of this transaction, WELLS purported to have retained a

security interest in 2410 Albatross St., Unit 12, which is sister's home, although

brother has a superior materialman's lien on the same property.

67.  The security interest WELLS claimed, if valid, was not created to

finance the acquisition or initial construction of the residence.

68.  This consumer credit transaction was subject to the borrower's right of

rescission described by 15 U.S.C. § 1635 and Regulation Z §226.23.

69.  In the course of this transaction lender World violated 15 U.S.C. § 1635

and Regulation Z §226.23 by failing to deliver to sister two copies of a notice of a

right to rescind that:

a.  Identified the transaction;

b.  Clearly and conspicuously disclosed the security interest in sister's

home;

c.  Clearly and conspicuously disclosed sister's right to rescind;

d.  Clearly and conspicuously disclosed how to exercise the right to rescind

23

the transaction, with a form for that purpose, designating the address of the lender's place of business;

    e.  Clearly and conspicuously disclosed the effects of rescission;

    f.  Clearly and conspicuously disclosed the date the right to rescind expires.

70.  WELLS, through World also failed to provide a disclosure statement as required by The Truth in Lending Act and Regulation Z and, therefore, hid the finance charge it was supposed to disclose under 15 U.S.C. § 1605 and §1638(a)(3) and Regulation Z §226.4 and §226.18(d).  The missing amounts include but are not limited to, (i) any broker fee, (ii) credit report fees, (iii) all recording fees, and (iv) any settlement fees.

71.  By improperly including all of these charges in the amount financed the defendant creditor failed to disclose the amount financed and this was a violation of 15 U.S.C. § 1638(a)(2)  and Regulation Z §226.18(d).

72.  The defendant also failed to disclose the correct annual percentage rate (APR) and had the lender done so it would have been false because it did not take into consideration all of the charges and this was a violation of 15 U.S.C. § 1638(a)(4)  and Regulation Z §226.18 ( c).

73.  The disclosures as itemized above were material disclosures, as defined by the Truth In Lending Act, 15 U.S.C. § 1602(n) and Regulation Z § 226.23 n. 48.

74. The finance charge and APT were underdisclosed by more than the tolerance levels set forth in 15 U.S.C. § 1605.

75. By reason of those material violations, sister had a right of rescission for three years from the date of consummation of the loans, or from December 30, 2007, pursuant to 15 U.S.C. § 1635 (f).

76. However, that three year deadline was eliminated by the parties by express agreement at ¶ 21 in the deed of trust, wherein the lender waived the right to assert statutes of limitation as a defense and this waiver applies in the context of Truth In Lending law suits, since California law and courts allow such waivers. Dexter v. Pierson, 214 Cal. 247, 250-251 (1931) (mortgagor and lender may expressly waive the statutes of limitation defense in their mortgage contracts); Kerby v. Mortgage Funding Corp, 992 F.Supp. 787, 792 [2], [3], 795 (D. Md. 1998) (waivers by the gov't are strictly construed but waivers of statutes of limitation by private parties over RESPA and TILA are liberally construed so equitable tolling is available).

77. Therefore, this action for rescission under the Truth In Lending Act is timely.

78. Or, if it is not timely, on about June 1, 2018 sister propounded a new formal notice of rescission to WELLS and WELLS ignored it, failing to respond in any way in the 20 days the statute requires for a response.   Even if the original

2010 deadline for suit is not construed as waived by this court for any reason, that

2018 notice of rescission restarted the time within which to sue so this action is

timely.

79.  WELLS also purports to have sold the property on about March 4,

2019,  and if the sale were *bona fide*, it would have extinguished the right to sue

for  rescission on this Act under the rule in Mehta v. Wells Fargo Bank N.A., 737

F.Supp.2d 1185, 1192 (S.D. Cal. 2010)(sale is absolute bar to rescission), and

Takushi v. BAC Home Loans Servicing, LP, 814 F.Supp.2d 1073, 1081 (D. Haw.

2011) (rescission right extinguished where lender sold the property).

80.  However, that rule extinguishing the right to rescind does not apply if

the lender had no authority to sell, as in In re Gassaway, 28 B.R. 842, 848 (Bankr.

N.D. Miss. 1983)(right of rescission under TILA was exercisable by trustee and

not terminated by foreclosure sale where that sale was null and void as taken in

violation of the automatic stay).

81. Because the lenders provided no consideration for the loan transactions,

the deed of trust they acted under was null and void and they had no authority to

sell based on a blank paper, *so there was no sale* on March 4, 2019.  It was only a

sham.  Eitel v. Schmidlapp, 459 F. 2d 609, 612 at II (4th Cir. 1972) (A sale of land

done without the authority required for the sale is "not a bona fide sale at all"); OC

Interior Services, LLC v. Nationstar Mortgage, LLC,  7 Cal. App. 5th 1318, 1331-

32 (2017) ("An instrument that is void ab initio is comparable to a blank piece of paper and so necessarily derives no validity from the mere fact that it is recorded."); Heights Props. 1388 LLC v. Make Realty Corp., 506401/2013, 2014 NY Slip Op 51755 at Discussion (King's Cty. Dec. 15, 2014) (The contract of sale was not a sale, because it was not agreed-to by the corporation officers who had the authority to sell).

82. And even a county-issued grant deed is not proof that the sale was valid were there was no *bona fide* sale. Peterson v. Wells Fargo Bank, NA, 236 Cal. App. 4th 844, 854 (2015) (trust deed is not a sale even if it purports to convey property, and grant deed submitted as proof of sale is null and void).

83. Therefore, plaintiff has a right to ask a jury to determine that there was no sale of the subject property. Gold'n Plump Poultry, Inc. v. Simmons Eng. Co., 805 F. 2d 1312 (8th Cir. 1986) ("Whether or not a sale occurred is a question of fact for the trial court.").

84. If the jury finds there was no sale, then the time to rescind re-started on June 1, 2018 and brother has 3 years from that date to file this cause of action, and the court must hold that the bank's failure to respond to the notice of rescission cancelled the loan even if the loan were valid.

85. WHEREFORE, plaintiff seeks and is entitled to remedies according to statute against the assignee bank WELLS, since the missing parts were apparent

"on the face of the document" by virtue of the fact that there are no documents in

the loan file to suggests these missing papers were given to sister.

86.  These statutory remedies are the following:

a.  Rescission of the loans.
b.  Termination of any security interest in sister's home.
c.  Return of all money submitted by sister to the lenders.
d.  Damages of $2,000 for disclosure violations.
e.  Damages of $2,000 for the failure to respond to the rescission notice.
f.  Forfeiture of return of any loan proceeds proven by WELLS.
g.  Actual damages proven at trial.
h.  Attorney's fees.

15 U.S.C. §§ 1635 (a), 1640 (a), 1641( c), and Reg. Z.


**IV.**

**FOURTH  CAUSE  OF  ACTION  FOR  RESCISSION   OF  SALE**

**UNDER   CAL  CIV.  CODE § 2924h(g)**

87.  The allegations above are incorporated into this claim by this reference.

88.  CAL CIV. CODE § 2924h(g) allows an owner of property or a lineor

on that property to rescind a foreclosure sale by the mortgage holder on the

grounds that the sale was not *bona fide*, if the trustee executing the sale conspired

with the beneficiary lender to offer the property for sale after insufficient notice to

the public of sale so that few potential bidders were present to offer a full fair

market value of the property, according to U.S. v. Countrywide Home Loans, Inc. ,

408 F. App'x 3, 6 (9th Cir. 2010) ("because defendants are not bona fide

purchasers, Countrywide retains a valid lien on the home").

89.  This is a criminal statute that is allowed as a basis for a civil claim:

CAL  CIVIL CODE section 2924h, subdivision (g) provides that it is
unlawful for any person, acting alone or in concert with others,
(1) to offer to accept or accept from another, any consideration
of any type not to bid, or (2) to fix or restrain bidding in any manner,
at a sale of property conducted pursuant to a power of sale in a deed
of trust or mortgage.... [¶] In addition to any other remedies, any
person committing any act declared unlawful by this subdivision
or any act which would operate as a fraud or deceit upon any
beneficiary, trustor, or junior lienor shall, upon conviction, be
fined not more than [$10,000] or imprisoned in the county jail.
[T]he trustee, which was also a beneficiary under a deed of trust,
conspired "to conduct the sale in a manner calculated to `chill
the bidding' and [to] permit [it] to purchase the property at lower
than market value and to cause [the junior lien holder] to lose its
security interest."   South Bay, as a junior lienholder, clearly falls
with the class for whose benefit the statute was enacted and therefore
may use defendants' violation of the statute to establish civil liability.

South Bay v. Riviera Lend-Lease, Inc., 85 Cal. Rptr. 2d 647, 658 (1999).

90.  That is what happened on March 4, 2019: CLEAR  RECON advertised

the sale date only days before March 4, 2019 to prevent a full house of bidders to

appear and this allowed WELLS to take the property at a price that was

insufficient to compensate brother's superior lien on the same property.

91.  The conspirators, WELLS and RECON also failed to inform brother of

the sale date, knowing brother had a lien superior to that of the lenders here.

92.  Brother's lien came about because he did construction work on the

home in 1974 at 1132 Archer St. establishing an automatic lien enforced as a

mortgage for the value of that unpaid work in 1974 pursuant to California

Constitution, Article XIV, § 3.  That property was later formally mortgaged

without brother's knowledge, providing funds to pay for the properties at 2410

Albatross St. #12, at issue here.  In other words, the loan at issue in this action was

not used to pay for the purchase of this property at Albatross.   Instead, the loan

for the Archer St., was used, in part, to pay for the purchase of the property at

Albatross long before the World agreement for Albatross.

93.   That use of Archer St. money on which brother had a lien, transferred

brother's lien to the Albatross property under the doctrine of tracing, creating a

secured mortgage as "first in time" against Albatross in the 1st position, ahead of

the lenders in 2007, because brother's lien started in 1974.  In re El Dorado Imp.

Corp., 335 F.3d 835 (9th Cir. 2003)(under California law a holder of a mechanics

lien has priority over general creditors and also over any security interest that

came after the work on debtor's property began).

94.   Brother (this plaintiff) filed a proof of claim against the Albatross house

on about February 18, 2018, on these bases, claiming $400,000 as a first priority

lien superior to that of WELLS, in the bankruptcy court in In re Bauman, 17-

06250 (S.D. Cal. 2017), and no party objected to it, and WELLS was a party in

that action and also did not object to it.  That bankruptcy judge ruled that failure of

a formal objection to a claim allows the claim as valid.   So brother's claim was valid and in first priority over any interest WELLS claimed.

95.   Therefore, *if* the WELLS loan is valid, brother's lien against the Albatross house was ahead of that lien in priority and WELLS had a duty to inform brother of a planned sale and WELLS and its trustee RECON violated CAL CIV. CODE § 2924h by setting the sale date in a way to prevent other bidders from attending to prevent a full market value sale and to allow brother to be paid his full lien first.

96.   WHEREFORE, brother seeks and is entitled to a ruling setting-aside the sale *if* it is a sale, under CAL CIV. CODE § 2924h(g).

## V.

## FIFTH CAUSE OF ACTION FOR CONVERSION

97.   The allegations above are incorporated into this claim by this reference.

98.   A plaintiff proves conversion by alleging and showing evidence of "any act of dominion wrongfully exerted over another's personal property", and harm to the owner or person with the superior right over the property.  Fischer v. Machado, 50 Cal.App.4th. 1069, 1973 (1996), Burlesci v. Peterson, 68 Cal.App.4th 1062, 1065 (1998).

99.   Both defendants committed conversion in two ways.

100.  The first way they committed conversion was by blocking brother and sister's use of the property for 8 years with a Slander of Title, from 2011 by making false claims of foreclosure rights on the property which prevented bother and sister from mortgaging the property to make payments on and saving the $2.2 million Archer house, and to do other things with the money like paying condo dues to avoid harassment and stress and law suits from the homeowners association for Albatross, and rebuilding sister's real estate business.  A Slander of Title is "an unprivileged or malicious publication of a false statement that disparages plaintiff's title to real property and causes pecuniary loss" or injures "salability of property" under Truck Ins. Exch. v. Bennett, 53 Cal. App. 4th 75, 84 (1997).

101.  The second way they committed conversion was by purporting to sell the property in 2019 when they had no such right because there was no valid loan agreement, so RECON had no right to sell which a *valid* deed of trust night permit. That committed conversion by exercising a right of sale that belonged only to brother as 1st lienor or sister as owner and taking the money from the sale to give to the company pursuing this bluff, WELLS, and then giving that same money back to  WELLS.   Gherman v. Colburn, 72 Cal.App.3d 544, 568 (1977) (Although there is no tort of conversion of real property in California, the right to sell and take the proceeds are personal property and may be the basis of a

conversion claim against a seller of the real property who had no right to take the money from the sale).

102. WELLS then committed conversion by "buying" the property it had no right to take because the owner (sister) and the lienor (brother) had no desire to sell. Regent Alliance Ltd. v. Rabizadeh, 231 Cal.App.4th 1177, 1182 (2014) (innocent purchasers of converted goods may be liable for conversion when they took the property from another converter, following Witkin: "an innocent buyer from one without title of right to sell is ordinarily liable for conversion").

103. Brother and sister were harmed by the loss of control of the property from 2011 to 2018 and the economic harm it caused sister during that period as described in ¶¶ 29-31 above, and by the emotional stress and physical injuries visited upon brother more fully described in the cause of action for emotional distress below.

104. This "blocking" of the rights of brother and sister to take their desired actions was an actual or proximate cause of the harm described above.

105. The cost of that emotional distress is expressly allowed as a jury award for damages under California law at Gonzalez v. Personal Storage, Inc., 56 Cal. App. 4th 464, 475-479 (1997)(if conversion of property is the legal cause of the harm to the plaintiff, damages may be allowed for that harm, even if the conversion only humiliates plaintiff and the defendant should have realized that

emotional distress would follow).

106.  And a jury award of punitive damages is also permitted according to
In re Brian S., 130 Cal.App.3d 523, 530 (1982).

107.  WHEREFORE, brother as assignee of his sister's claims for
conversion for the period 2011 to 2018 seeks and is entitled to $3 million in actual
and consequential damages against each defendant, related to sister's *economic*
losses from her real property, and $10.9 *billion* in punitive damages.

108.  And brother on his own behalf as lienor for the same property for the
period 2018-2019 leading to the purported sale seeks and is entitled to $400,000
for the value of his lien, and $100,000 for emotional distress to brother alone, and
$10.9 billion in punitive damages from each defendant.


## VI.

## SIXTH  CAUSE  OF  ACTION  FOR  INTENTIONAL  OR
## NEGLIGENT  INFLICTION  OF  EMOTIONAL  DISTRESS


109.  The allegations above are incorporated into this claim by this
reference.

110.  The jury may award damages for this cause of action when the
plaintiff proves (a) severe emotional injury, (b) caused by defendant's outrageous

conduct, © without privilege by the defendant, (d) intending to cause or with

reckless  disregard for the probability of causing emotional distress, according to

Huntingdon Life Sciences v. Stop Huntingdon Aminal Cruelty USA, 129

Cal.App.4th. 1228 (2005).

111.  As for (a)  The severe emotional distress visited upon brother was his

involuntary reaction to his sister's deteriorating mental, emotional, and physical

condition watching his sister's painful slide into paralysis, stroke, coma, and near

death as a result of the "bluff" of these defendants pursuing this property

ruthlessly year after year from one bankruptcy to another, until brother was finally

hospitalized in 2018 in part, from the break-down of his own body functions

worrying about his sister's deteriorating condition.

112.  A brother has standing to sue for his own distress from the harm

visited upon his sister under the rule in Thing v. LaChusa, 48 Cal.3d 644, 663-664

(1989)(emotional distress to relative at a distance from the actual injury states a

claim).

113.  The deadline within which to sue is two years after the date that the

stress  took effect to seriously harm the plaintiff, according to Holiday v. Jones,

215 Cal.App.3d 102, 120 (1989).

114.  As for (b), the actions to throttle and punish sister by the defendants

were an actual or proximate cause of brother's distress starting in late 2017, for

which brother gave notice to defendants as a part of the adversary action he filed in the bankruptcy court in February 2018, but which the bankruptcy judge would not permit to be formally served and prosecuted because the judge was preparing to end that bankruptcy or lift the stay so brother and sister could bring the same claims in courts outside of bankruptcy, which the judge did in May 2018.

115.  Behavior may be considered outrageous if a defendant 1) abuses a relation or position which gives him power to damage the plaintiff's interest; 2) knows the plaintiff is susceptible to injuries through mental distress; or 3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. <u>Newby v. Alto Riviera Apartments</u>, 60 Cal. App. 3d 288, 297 (1976).

116.  California courts have ruled the position of creditor over the plaintiff by itself creates a power to harm in this way which the creditor abuses by unlawful collection actions, in <u>Bundren v. Superior Court</u>, 145 Cal. App. 3d 784 (1983), and a California appeals court has ruled that a jury may find outrageous conduct if the defendant knew at the time the actions were committed that the plaintiff was suffering from them.  <u>Cochran v. Cochran</u>, 65 Cal. App. 4th 488, 494 (1998). Defendants knew brother and sister both were susceptible to injuries through mental distress caused by these defendants because sister told them so during her multiple bankruptcies and brother told them so in an adversary complaint

36

submitted to them in February 2018.   Therefore their acts were outrageous.

117.  Brother finally sought medical attention in 2018 in three hospitals in

Ohio in part, because of emotional distress, and has been on medication ever since.

118.  Although there were additional causes for the total emotional distress

experienced by brother in 2018 including a car accident in late 2018 that ended

brother's ability to work, the stress created by these defendants need not be the

sole cause of the harm to brother during this period and a jury may still allow a full

award of damages that it believes is warranted by the actions of these defendants.

Scirex Corp. v. Federal Ins. Co., 313 F.3d 841,  849-50 (3d Cir. 2002)(the direct

cause of a loss "does not have to be the sole cause or immediate cause" of

plaintiff's loss for him to prevail, "but need only be a proximate or substantial

cause" of the loss to allow a damages award).

119.  As for ( c), the defendants had no lawful excuse or privilege for

continuing to threaten sister's home and imposing stress on sister that hurt her

medically because they had no right to commit fraud on the public by pretending

they had powers to act under the deed of trust.   Therefore, they had no privilege to

harm brother with the same conduct either.

120. As for (d), the defendants intended to hurt sister with this constant

threats of foreclosure and eviction and death, hoping she would die to get her out

of the way so they could take her property.   And they demonstrated reckless

disregard for the stress caused to brother after brother informed them in the 2018 bankruptcy action he was being hurt.

121.   The sham sale of March 4, 2019 only aggravated brother's stress-based injuries.  As of the drafting of this complaint brother is attached to a medical device 24 hours a day and takes medications, and visits medical providers almost every week, to try to reverse some of the damage caused by these defendants.

122.   As a result, brother has lost all of 2019 and is unable to work because he is connected to a medical device and has stress and sleeping problems related to the stress, and has had to undergo almost two years of pain and suffering from the stress separate from medical costs.   A jury may award these losses as compensatory damages according to CAL. CIV. CODE §3333.

123.   Additionally, these facts show malice by the defendants for deliberately continuing the scam after 2016 when the bank's own investigation revealed there was no loan money given to sister to begin with so the bank gave no consideration and had no power to demand anything and no legal justification for causing distress of any kind.

124.   In fact, it is even more clear that these defendants had malice in wrongfully advertising foreclosure to seize sister's home after 2016 because in the bankruptcy In re Bauman, 16-301 (Bankr. S.D. Cal. 2016), the judge set a date for claimants to file proofs of claim on June 3, 2016, which was 90 days after the first

date set for the Section 341 trustee's meeting with the debtor-sister. But WELLS

missed that date, and did not file their (fake) proof of claim until July 2016.

125. Missing that deadline that had the effect of extinguishing all secured

claims of WELLS against the Albatross property if there were any, under <u>Perry v.

Certificate Holders of Thrift Savings</u>, 320 F.2d 584, 589 (9ᵗʰ Cir. 1963) ("a claim

must be proved within a fixed time and that if not so proved, it may not be

allowed") and <u>In re Prestige Ltd. Partnership- Concord</u>, 234 F. 3d 1108, 1118 (9ᵗʰ

Cir. 2000) ("[U]nder Rule 3002(c)(3) a previously secured creditor who did not

file a secured claim may file an unsecured claim . . .. East Bay's security interest

was deemed waived").

126. Therefore, as of June 3, 2016 WELLS was only an unsecured claimant

with no right to foreclose or sell anything, but continued to act as if they were a

full secured creditor, and continued to demand the Albatross property by

foreclosure notice in October 2017 without standing to do so, thereby starting a

dangerous emotional turmoil for both debtor which sent brother to the doctor, and

forced a new filing of bankruptcy on October 16, 2017.

127. So, WELLS knew there was no loan since inception, and WELLS

knew its own investigation proved no loan was worked and no check was made,

and WELLS *knew* if it had any secured claim that claim was extinguished in June

2016 in the bankruptcy court. But they persisted in their bluff anyway, knowing

the stress was killing sister and hurting her brother, this plaintiff.   That is malice.

128.  Therefore, a jury may award punitive damages as well, which need not

be based on the actual medical costs, but on a percentage of the fair market value

of the corporations as a punishment factor, according to CAL. CIV. CODE §3294

and Slaughter v. Legal Process & Courier Service, 162 Cal. App. 3d 1236, 1252

(1984) (punitive damages are recoverable on showing of malice ).

129.  WHEREFORE, brother seeks on his own behalf and is entitled to

$300,000 in damages for lost time and pain and suffering, and $10.9 *billion* in

exemplary or punitive damages based on 1% of the net worth of WELLS as one of

the largest banks in the world with $1.9 trillion in assets, under the California rule

from the San Diego appeals court in Devlin v. Kearny Mesa AMC/Jeep/Renault,

Inc., 155 Cal. App. 3d 381, 391 (1984)("Net worth generally is considered the best

measure of a defendant's "wealth" for purposes of assessing punitive damages . . ..

Although the award, representing 17.5 percent of Kearny Mesa's annualized net

worth or almost 4 months net profit, is somewhat greater than comparable ratios

contained in the reported cases (see appendix), we cannot say these numerical

differences mandate a finding of excessiveness".).

130.  These allegations are verified.

DATED:  July 31, 2019          _____

                               Mel  Marin

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Mel Marin

**DEFENDANTS**
Wells Fargo, NA, Clear Recon

**(b)** County of Residence of First Listed Plaintiff    Oneida, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    S Dakota
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1  U.S. Government
Plaintiff

❏ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 2  U.S. Government
Defendant

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ☒ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | ❏ 350 Motor Vehicle | ☒ 370 Other Fraud | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | | | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | | | ❏ 864 SSID Title XVI | |
| | | | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 550 Civil Rights | ❏ 465 Other Immigration Actions | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

❏ 2 Removed from
State Court

❏ 3 Remanded from
Appellate Court

❏ 4 Reinstated or
Reopened

❏ 5 Transferred from
Another District
*(specify)*

❏ 6 Multidistrict
Litigation -
Transfer

❏ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:
Fraud and conversion by defendants asserting a right to foreclose that did not exist

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $
10.9 billion

CHECK YES only if demanded in complaint:
JURY DEMAND:  ❏ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
07/31/2019

SIGNATURE OF ATTORNEY OF RECORD
*Mel Marin*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____



U S District Court
515 9th St. #302
Rapid City, South Dakota
57701

m Ma
Box 4C
Getzville, NY 14068

