Mel Marin                    June 22, 2020
Box 710561
San Diego, CA  92171

Jordana Bauman
415 Laurel St., FRONT PMB 440
San Diego, CA  92101

Plaintiffs
*Pro Se*

## UNITED  STATES  DISTRICT  COURT

## FOR THE  DISTRICT  OF  SOUTH  DAKOTA

| | | |
|---|---|---|
| MEL MARIN, | ) | CIV 19-5057-JLV |
| JORDANA BAUMAN, | ) | |
| | ) | FIRST  AMENDED |
| Plaintiffs, | ) | COMPLAINT  FOR  DAMAGES |
| | ) | FOR FRAUD, AND  FOR |
| v. | ) | VIOLATION OF THE |
| | ) | CALIFORNIA UCL, AND FOR |
| WELLS FARGO,  N/A, | ) | RESCISSION, AND FOR |
| CLEAR  RECON CORPORATION, | ) | CONVERSION, AND  FOR |
| | ) | CREDIT  DEFAMATION, AND |
| | ) | FOR  EMOTIONAL DISTRESS, |
| | ) | AND  FOR |
| | ) | VIOLATION  OF  THE TILA |
| | ) | AND  FOR |
| | ) | VIOLATION  OF  THE RESPA |
| | ) | AND  FOR |
| | ) | VIOLATION  OF  THE  HOEPA |
| | ) | |
| Defendants. | ) | JURY  DEMANDED |

## PRELIMINARY  STATEMENT

1.   Plaintiffs come here to prosecute state law claims for sale rescission, conversion, credit defamation, emotional distress and personal injury, loan fraud, for violations of the California Unfair Competition Law, for relief under the Truth In Lending Act, 15 U.S.C. § 1601  (hereafter "the TILA") and RESPA, to void the defendant's claimed security interest in the subject property *ab initio* if it ever was valid, and for rescission and to recover compensatory, statutory, punitive damages, restitution, and attorney's fees and costs by reason of the defendants' violations of the TILA and Regulation Z, 12 C.F.R. § 226 and RESPA and HOEPA.

## JURISDICTION

2.   This court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 based on 15 U.S.C. § 1601, and for declaratory judgment based on 28 U.S.C. § 2201, and additional supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

3.   This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and Plaintiff Marin ("Brother") is domiciled in New York, Plaintiff Bauman ("Sister") is domiciled in California, while the domicile of Wells Fargo (hereafter "WELLS") is in South Dakota, as determined by <u>Morales v.  Wells Fargo Bank, NA</u>, 845 F. Supp. 2d 1034, 1061 (C.D. Cal. 2012)("the court concludes that Wells Fargo is a citizen

2

only of South Dakota, not California"), and for CLEAR RECON it is Delaware.

4.   The mortgage agreement and deed of trust at issue were created on about July 26 and July 30, 2007.

5.   Relevant statutes of limitation are not a concern here for two reasons.

6.   First, the lender expressly agreed to waive resort to the defense of statutes of limitation at ¶ 21 of the deed of trust which created a judicial estoppel barring  that defense from being considered by this court as to any claims arising from these loan agreements:

> **WAIVER OF STATUTE OF LIMITATIONS**
> **I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Agreement, including any obligations referred to in this Security Agreement of Secured Notes.**

DEED OF TRUST, San Diego County Recorder 2007-0524636, ¶ 21, p. 10980 (<u>Dexter v. Pierson</u>,  214 Cal. 247, 250-251 (1931) (mortgagor and lender may expressly waive the statutes of limitation defense in their mortgage contracts)).

7.   WELLS has also asserted elsewhere that there is a different junior deed of trust for a credit line for the same property with deed terms that are not entirely the same. However, under California law, both deeds are treated as one and claims under the credit line are extinguished where the bank attempts a sale:

> [W]hen the same party holds separate deeds of trust on the same real property and forecloses under the senior deed of trust's power of sale, thereby eliminating the security for its junior deed of trust, the two secured obligations are treated as one. Thus, section 580d

bars recovery of any balance owing on the obligation secured by
the junior deed of trust.

Evans v. California Trailer Court, Inc., 28 Cal. App. 4th 540, 561 (1994).

8.   This express waiver applied not only to the state law claims arising from

the mortgage agreement, but also to related claims under federal statutes as tolling,

according to Kerby v. Mortgage Funding Corp, 992 F.Supp. 787, 792 [2], [3], 795

(D. Md. 1998)(waivers by the gov't are strictly construed but waivers of statutes

of limitation by private parties over RESPA and TILA are liberally construed so

equitable tolling is available).

9.   Second, even if the waiver of limitations were not valid for any reason,

the prosecution of the rights asserted herein was also subsequently extended

because of the filing of Title 11 actions in the United States Bankruptcy Court for

the Southern District of California for the period October 26, 2010 with the filing

of  action In re Bauman, 10-18930 (Bankr. S.D. Cal. 2010) to May 2019 after the

order lifting the bankruptcy stay in In re Bauman, 18-02875 (Bank. S.D. Cal.

2018), because until that order lifting the stay, the rights to rescind and to act on

any causes of action were exclusively under the possession and control of the

Bankruptcy Trustee and that officer refused to agree to Sister's written request to

lift the stay before May 2018 so that Sister could prosecute these claims, tolling

the running of any limitations periods under the rule in (In re Merrick, 175 B.R.

333, 336 (B.A.P.  9th Cir. 1994) (only the trustee may take offensive action on a

4

debtor's claim without approval of the court because "a debtor's lawsuit constitutes a chose in action that is property of the estate"); Lane v. Vitek Real Estate Industries Group, 713 F. Supp. 2d 1092, 1097 (E.D. Cal. 2010) (borrower has no standing to sue because "a bankruptcy petitioner loses standing for any causes of action and the estate becomes the only real party in interest unless the bankruptcy trustee abandons the claims"); In re Corbett, Adv. No. 14-01089 (Bankr. E.D. Cal. March 14, 2016)-A ("personal-injury causes of action **are property of the estate**" so debtor may not pursue her own claims for personal injury); Moralez v. Vilsack, No. 1:16-cv-282, 2017 U.S. Dist. LEXIS 201974 at *6 [2] (E.D. Cal. Dec. 6, 2017)(plaintiff's argument that she has a right to sue without bankruptcy court approval because she is a debtor, fails,  since **she cannot file a suit on her own behalf for her crop loss** while in bankruptcy because once she files bankruptcy "she no longer possesses an interest in that claim"); Kertesz v. Ostrovsky, 115 Cal.App.4th 369, 378 (4th Dist. 2004)(San Diego Court of Appeal)(trial court erred in granting demurrer and failing to toll the time the plaintiff's prior action was in bankruptcy court, and should have allowed the new filing after a 10 year delay because of the bankruptcy);  Schumacher v. Worcester, 55 Cal.App.4th 376, 380 (1997)(all statutes of limitation were tolled during the period of the automatic stay in bankruptcy proceedings and that time should not be counted for limitation purposes and is time taken out" of the running); Canterbury

v. J.P. Morgan Acquisition Corp., 958 F.Supp. 2d 638, 649 (W.D. Va., 2013)

(TILA right of rescission is property of the estate as personal property or cause of

action once a Chapter 7 bankruptcy action has been filed, and can only be

exercised by the bankruptcy trustee, citing 3rd, 4th and 7th Circuits, so the debtor

has no standing); Lausier v. Goodwin, 7 B.R. 476, 478 at [2]  (Bankr. D. Maine

1980)(on entry of the Chapter 7 order, "the debtor's right of rescission became

property of the estate . . exercisable exclusively by the trustee in bankruptcy).

10.   Third, although Sister filed actions in the state court on her own behalf

with claims similar to those in this complaint at Bauman v. Wells Fargo, 37-2018-

28859 (Super. San Diego, 2018), and Bauman v. Wells Fargo,  37-2019-16452

(Super. San Diego, 2019), those actions were dismissed on the basis of statutes of

limitations for Sister's failure to allege the waiver of the lender of statutes of

limitation which is expressly alleged in this complaint at ¶ 6 above.

11.   Because a statute of limitations dismissal in California is a dismissal for

lack of jurisdiction, the filer may re-file the same action again and add the missing

allegations to give the court jurisdiction and continue without the bar of *res*

*judicata*, according to Jones v. Tracy School Dist., 27 Cal.3d 99, 108  (1980)(a

dismissal for statute of limitations is a dismissal for lack of jurisdiction) and

CTI Audio v. Fritikin-Jones Design Group, 144 Ohio App.3d 449, 453-54 at [5]

(2001)(if dismissed initially for lack of jurisdiction, plaintiff may re-file again and

supply the missing "jurisdictional allegation" in the next court).

12.    Moreover, those state courts actions are not final to impose *res judicata* because Sister has appealed those dismissals to the California Supreme Court and that court has not yet ruled. Ward v. Resolution Trust Corp., 972 F.2d 196, 198 [4] (8th Cir. 1992)(*res judicata* does not apply because the state judgment is not final until the state supreme court rules.)

13.    And because this action was filed before that state dismissal is final since the California Supreme Court has not yet ruled, rulings in those state actions that could impose a res judicata bar do not affect this action because this was filed before that dismissal is final.   McKithen v. Brown, 481 F.3d 89, 97 (2nd Cir. 2007) (federal action filed before a final state ruling is a Rooker-Feldman exception that allows the federal court to continue).

14.    Additionally, although Sister and Brother are on the same side of this litigation against a common enemy, they are still adversaries outside of this forum because Sister does not acknowledge Brother's trustee's lien on her property and has no desire to protect Brother's claim.

15.    Therefore, in the event the prior state court actions imposed a prejudice to any claims of Sister for any reason, the competing claims of Brother and Sister prevented Sister from being a virtual representative of Brother in those actions so any prejudice to Sister from those state actions could not contaminate Brother's

claims to the same property under the rule in <u>Black Clawson Co., Inc. v. Kroenert</u> <u>Corp.</u>, 245 F. 3d 759, 764 (8th Cir. 2001)(party in the first action with no incentive to protect the claims of the related party cannot be considered a virtual representative of the related party to raise <i>res judicata</i> against the related party).

16.    Sister would have been first alerted to the possibility of fraud in mid-2011 after WELLS refused to accept tenders of payments and also refused to respond to her requests for reasons for the refusals.    From mid-2011 to the present, the only times the automatic bankruptcy stay was not in force was from 7/28/15 when action 11-11223 was dismissed to 1/25/16 when action 16-301 was filed, and after May 26, 2018 when the bankruptcy judge lifted the stay.

17.    In the event statutes of limitations is an issue here despite the lender's agreement not to raise it, the total time that statutes of limitations were not stopped, therefore, was at most 5 months in 2015 and 24 months since May 2018 when the last bankruptcy court lifted the stay.    Because that is less than 6 years for the deadline for a fraud claim, this action is timely.    <u>Bruske v. Hille</u>, 1997 S.D. 108, 567 N.W. 2d 872, 875, ¶ 10 (1997)("With fraud and deceit, the six-year statute of limitations applies").

18.    Additionally, California substantive law imposes the rule that if one claim is timely under the longest statute of limitations, it protects all other claims in the same law suit, according to <u>Pugliese v. Superior Court</u>, 146 Cal.App.4th

1444, 1453, 53 Cal.Rptr.3d 681, 687 (2007)(a claim filed under a short deadline to sue is automatically extended to equal the longest time available in any other cause of action against the same defendants or their co-conspirators so that all of the injuries may be considered a "continuous whole" injury and the time within which to sue does not start until the widest period allowed for all of the claims).

19.   Therefore, since the claims arose in California, all of the causes of action asserted herein are timely.

## PARTIES

20.   Brother is a natural person and alleges he has a trustee's lien on Sister's property at issue here, and he appears as a trust officer for the family trusts to enforce that lien under the rule in Monterey S.P. Part v. W.L. Bangham, 49 Cal.3d 465, 462, 261 Cal.Rptr. 587, 592 [10](1989)(the trustee of an express trust" *must* take reasonable steps to defend actions that may result in a loss to the trust") and Citibank v. Miller & Schroeder Financial, Inc., 168 Ariz. 178, 183 [7], 812 P.2d 996 (App. 1990)(trust imposes "an affirmative duty" on the trustee to sue for fraud to recover trust assets because the trustee is an injured party with standing separate from the beneficiary who is indirectly injured by the loss).

21.   Brother also alleges personal injuries to himself by the willful conduct of the defendants that almost killed Sister, under the rule in Thing v. LaChusa, 48

Cal.3d 644, 663-664 (1989)(emotional distress to relative at a distance from the actual injury states a claim).

22.   Sister is a natural person and appears to prosecute her own claims and does not acknowledge nor agree to Brother's liens on the property at issue.

23.   WELLS is a corporation licensed by this state and conducts consumer creditor transactions of the type at issue here.

24.   RECON is incorporated in Delaware and is a Delaware citizen.

## I.

## FIRST  CAUSE  OF  ACTION  FOR   FRAUD

25.   Sister Bauman executed mortgage loan agreements on about July  26, 2007 at about 2pm and on July 30, 2007 at about 4pm, at San Diego, California, to borrow money from World Savings Bank FSB which was intended by the parties to be secured by a deed of trust against the property at Unit 12, 2410 Albatross St., San Diego, California 92101, under terms set forth in writing and orally, and an excerpt of written duties is set forth in the deed of trust attached  hereto, and which were supposed to be funded after execution of this deed evidencing secured loans.

## Failure  Of  World  Savings  To  Fund  The  Loan

26.  However, although the debtor executed the loan agreement(s) in good

faith, the loan was never funded.   This was because, unknown to Sister, World Savings  was unable to fund new loans because of violations of federal lending laws involving other borrowers that effectively "froze" their ability to do lending business in 2007 and placed the bank under the direct control of the United States before the deed of trust was executed.

27.   The bank knew at the time they could not and would not fund the loans described above because they had no power to pay loan money agreed-to, but continued to represent that they would fund the loans and continued to elicit cooperation by plaintiff's Sister in executing the security agreements in the hope of encumbering plaintiff's property and deceitfully generating monthly payments for the loans from Sister to "pad" the balance sheets of the bank to give the impression of better financial health than the bank could lawfully represent.

28.   Because World/Wachovia did not advertise this deceitful scheme there was no way Sister could have known that she was being "railroaded" into giving up her home and her money by signing the deed of trust, and she would not have made the loan agreement had she known it was a scam.   Sister acted reasonably, therefore, believing the bank was not lying to her, and made monthly mortgage payments to the extent of $100,000 while waiting for the loan money to be paid to her following their demand for payments to prove she could make them without loan money so she would not be borrowing to live off the loan as some do,

resulting in draining of her personal savings and losing the ability to pay dues and costs for  her condominium home which the loans in part, were supposed to pay.

29.   By directive of the federal government, World Savings ceased to exist and their contracts and duties were taken over by Wachovia Bank who also failed to fund the loans while plaintiff kept paying monthly.

30.   Wachovia was also frozen for similar unlawful banking practices as World, culminating on about November  1, 2009 by a "take-over" by WELLS.

31.   As the acquiring bank, under state and federal laws WELLS took upon itself the assets and liabilities of the acquired entities World and Wachovia, including a liability for all legal claims against World and Wachovia.


**WELLS Also Failed To Fund And Continued The Bluff**

32.   Like Wachovia, WELLS refused to execute the burden of funding the loans at issue here and sought only to take the benefits of monthly payments.

33.   The failure and refusal of WELLS to make good on the loan agreement by failing to fund it constituted a breach of the covenant of good faith, and the banks' intentional misleading of Sister from the time she signed the deed of trust and commenced making payments when the lenders knew they would never actually fund the loans, was a deliberate deceit.

34.   Sister did not know the banks would never find the loans and begin to

12

suspect fraud until WELLS refused to accept any more monthly mortgage

payments on May 11, 2011, and refused to explain why after Sister made written

and phone inquiries.   WELLS also refused to refund any of the approximately

$20,000 in total payments she made, keeping all of it.  And WELLS spent the next

8 years giving notice of default, and advertising foreclosure sales to the public,

reporting that Sister failed to make monthly mortgage payments after May 2011,

and forcing Sister to file bankruptcy to stop foreclosure in 2011 after Sister had

already filed a bankruptcy in 2010 to stop the condo association from threatening

her, until WELLS and its conspiring trustor CLEAR  RECON failed to inform

Brother of their sale plan and executed a *purported* sale on about March 4, 2019 to

WELLS, the defendant here.

35.   In other words, the lenders never funded the loans, but used the deed of

trust Sister signed in good faith, to support their unlawful seizure of her home.  It

was a "bluff", a fraud on Sister and on the public.

36.  The damage from this long-range scheme was this:

(a)   It prevented Sister from paying monthly condominium fees for years,

resulting in the condominium association suing Sister for over $50,000 in late fees

and penalties and threatening foreclosure of her property, disconnecting utilities to

chase her out, and stealing and discarding her mail to punish her.

(b)   It prevented Sister from improving and selling the same property at

Albatross St. to continue her real estate business which could have generated at least $70,000 a year in income for the period 2008 to 2018, creating an "opportunity cost" or loss, of $700,000.  Meyer v. Sprint Spectrum LP, 45 Cal. 4th 634, 640 n. 1, 200 P. 3d 295 (2009) (lost opportunity cost as other uses foregone is a proper method of assessing damages claimed).

( c )  It caused the loss of Sister's property at 1132 Archer St. in San Diego because she could not continue making mortgage payments on that home, at a loss of $2.2 million.

(d)  It caused the *sham* sale of the property at Albatross on March 4, 2019, denying plaintiff the $365,000 estimated sales price of the condominium.

(e)  It caused Sister severe emotional distress and personal injuries like stroke, coma, and internal injuries caused by stress, because of the threats of law suits and legal actions taken by the condominium group, and because of multiple threats of foreclosure by WELLS when WELLS knew it had no right to claim default and no right to foreclose, and no right to create the stress and injuries visited upon Sister.

(f)  It consumed a substantial portion of Brother's professional life for 9 years, destroying his ability to do other work because of a need for researching, drafting, filing and arguing in bankruptcy courts and other federal courts to protect his Sister's property from loss.

(g)  It caused personal injuries to Brother as described below watching his sister suffer repeatedly from the fear of eviction and death.

36.  These fraudulent claims were an actual, and proximate cause of these losses.

37.  Moreover, records supplied by WELLS to Sister during some of this litigation over the past 9 years prove that WELLS knew or should have known that they had no right from the beginning to bluff, and had no right to continue their "bluff" after 2016 because internal bank records dated in March 2016 admitted that the loans at issue were "never worked" and that there was no record anywhere of any check being issued for anything.

38.  WELLS knew therefore, after their internal investigation in 2016 that it was executing a bluff against Sister and against the public by reporting falsely that Sister failed to make mortgage payments to repay a loan that was never made, and WELLS knew it was causing stress and anxiety to Sister, and knew that stress was creating medical problems but intentionally continued those false reports and threats of foreclosure in an effort to cause the stroke that crippled Sister, to kill Sister to get her out of the way so the bank could seize her home without delay.

39.  This conduct proves deliberate and severe malice that is unconscionable in civil society.

40.  Although other problems of Sister like unrelated health difficulties may

have been an additional cause of Sister's inability to continue her real estate

business during these years, a jury is still entitled to make an award of damages

against WELLS based on the conduct of any of the lenders named here because

WELLS is fully responsible for the conduct of all 3 lenders if the jury agrees that

the conduct of any of them was still a *substantial cause* of these losses of Sister,

under the rule in <u>Scirex Corp. v. Federal Ins. Co.</u>, 313 F.3d 841,  849-50 (3d Cir.

2002) (the direct cause of a loss "does not have to be the sole cause or immediate

cause" of plaintiff's loss for him to prevail, "but need only be a proximate or

substantial cause" of the loss to allow a damages award).

41.   Under California law, applied here because the loan contracts were

made in California, a jury is entitled to award damages for fraud from a

preponderance of evidence that shows the following: (1) World misrepresented it

had the power or desire to execute the loan documents and fund the loan knowing

that representation was false (CAL. CIVIL CODE §§ 1572, 1710), and (2) that

was fact misrepresentation material to the agreement and important enough that a

party would not have executed the contract if they had known the truth

(<u>Roddenberry v. Roddenberry</u>, 44 Cal. App. 4th 634, 665 (1996)), or (3) where the

misrepresenting party knew or should have known their representation was false

(<u>Cicone v. URS Corp.</u>, 183 Cal. App. 3d 194 (1986)), or (4) intended to induce the

innocent party to rely on the misrepresentation (CAL. CIVIL CODE § 1572), and

16

(5) where the innocent borrower justifiably relied on the belief that the bank's conduct would be fair in the transaction (Lovejoy v. AT&T Corp., 92 Cal. App. 4th 1016 (2001)), and (6) where the misrepresentation was an actual, proximate or substantial cause of harm to the borrower (Nagy v. Nagy, 210 Cal. App. 3d 1262, 1268 (1989).).

42.   Each of these is met.  Element (1) is alleged above at ¶27.  Element (2) is alleged at ¶ 28.  Element  (3) is alleged at ¶ 27.  Element (4) is alleged at ¶27. Element (5) is alleged at ¶28.    Element (6) is alleged at ¶¶ 35-36.

43.   WHEREFORE, Sister seeks and is entitled to $3 million in actual and consequential damages related to her *economic* losses from her real property, and Brother seeks and is entitled to $2 million for lost opportunity costs for the time he had to devote to protecting his sister's property and her life from these attacks over a 9 year period, as in US v. Berkowitz, 927 F. 2d 1376, 1390 (7th Cir. 1991)(a party may claim $100,000 for its estimated time without proof of actual time spent to replace lost documents because "time a person spends doing one thing is time that person cannot spend doing something else; therefore, opportunity costs must also be factored into the cost of replacing the documents").

44.   Additionally, WELLS and its "side-kick" and co-conspirator RECON demonstrated malice by continuing to press for foreclosure after the 2016 internal investigation of the bank proved they had no such power.

45.   Therefore, and Brother seeks another $2 billion and Sister seeks and is entitled to another $10.9 *billion* in exemplary or punitive damages based on 1% of the net worth of WELLS as one of the largest banks in the world with $1.9 trillion in assets according to Bankrate.com as of May 30, 2019, and from www.macrotrends.net/stocks/charts/WFC/wells-fargo/ net-worth, and this is an amount that a jury may lawfully award – where courts have ruled a punitive claim of as high as 17% of the net worth of the offending corporation is not excessive regardless of actual losses to the person harmed, because the purpose of punitive damages is not to compensate for actual losses, but to discourage rich companies from continuing their wrongful conduct against innocent borrowers, as in Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc., 155 Cal. App. 3d 381, 391 (1984)("Net worth generally is considered the best  measure of a defendant's "wealth" for purposes of assessing punitive damages . . .. Although the award, representing 17.5 percent of Kearny Mesa's annualized net worth or almost 4 months net profit, is somewhat greater than comparable ratios contained in the reported cases (see appendix), we cannot say these numerical differences mandate a finding of excessiveness".)  [San Diego Court of Appeal]; Ward v. Taggart, 51 California Supreme Court 2d 736, 743 (1959)("Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer. (See McCormick, Damages, 79; Morris, Punitive Damages in Tort  Cases, 44

Harv.L.Rev. 1173, 1185-1188.) [15] Such damages are appropriate in cases like the present one, where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained.").

## II.

## SECOND   CAUSE  OF  ACTION  FOR

## VIOLATION  OF  THE  CALIFORNIA  UNFAIR  COMPETITION  LAW

46.  The allegations above are incorporated into this claim by this reference.

47.  A business violates the California Unfair Competition Law when it does any unfair or fraudulent act even if it is not in competition with the person suing them:

> Unfair competition shall mean and include any unlawful, unfair *or* fraudulent business act or practice, and unfair, deceptive, untrue or misleading advertisement.

California Business And Professions Code Section 17200.

48.  As part of this "bluff" by this bank from the period 2011 to 2018, WELLS repeatedly and intentionally reported to credit bureaus that Sister missed monthly mortgage payments knowing Sister was not in default, designated Sister as "in default", and advertised the property for foreclosure sale, to give the

impression to the public that the bank had a legitimate right to mortgage payments and sale.

49.   The dates of these reports to the Equifax credit agency and to real estate marketing firms to sell the property include, but are not limited to on about June 10, 2011, July 10, 2011, October 10, 2012, November 10, 2012, December 10, 2012, September 10, 2015, October 10, 2015, November 10, 2015, December 10, 2015, September 10, 2017, March 10, 2018.

50.   The dates of reports to real estate marketing firms and public media by newspaper (through the San Diego Union) and internet, representing falsely that the bank had the right to sell, were on about January 1, 2013, February 1, 2013, January 11, 2016,  October 1, 2017, and April 15, 2018.

51.   However, the bank had no such right to report failures to make monthly payments and to report that they had a right to sell, and did so knowing they had no such right.

52.   This is because the loan was never funded and, therefore, there was no consideration by the lender to gain the right to monthly payments, nor the right to foreclose under the deed of trust, according to California law at CIV.  CODE §1550 and as held by Holcomb v. Long Beach Investment Co , 129 Cal.App. 285, 292 at [4](1933)(A contract not supported by consideration is an instrument *nudum pactum*, or void and unenforceable) and In re Amica Inc., 135 B.R. 534,

(Bankr. N.D. Ill. 1992)(failure to pay money agreed is a failure of consideration) and Richter v. Union Land and Stock, 129 Cal. 367, 372 (1900)(failure of one party to perform the contract constitutes a failure of consideration).

53.   The bank also had no right to represent that it had the power to report missed payments even *if* the mortgage agreement were valid, because the bank itself refused to accept continued tenders of payments and that extinguished any right of the bank to take any action as to that property *if* it ever had that right, as in Triad Data Services, Inc. v. Jackson, 153 Cal.App.3d Supp. 1, 9 (1984)(the refusing party has no standing to claim failure to pay the debt for the entire time "during which he so avoids payment") and Horizon Textiles, Inc. v. Pandelco, Inc., B226867, at E (Cal. Ct. App.  Dec. 20, 2012 )(the first party to fail to complete a essential element of the contract is estopped from claiming that the responding party breached its contract by failing to perform subsequent essential terms).

54.   And the bank also had no right to report failures to pay while Sister was a debtor in bankruptcy because in the bankruptcy the property and all rights and duties belonged to the bankruptcy trustee and the debtor had no duty to pay anything.

55.   Therefore, WELLS committed the unfair business practice of misleading the public by furnishing to a consumer reporting agency information

that it knew was false and these false reports were the actual cause of Sister's

inability to get any loans for anything for the last 20 years, destroying her ability

to pay bills, and run her real estate business and even to pay for excess medical

help. This was violation of the California's Consumer Credit Reporting Agencies

Act (CCRAA), which provides that "`[a] person shall not furnish information on a

specific transaction or experience to any consumer credit reporting agency if the

person knows or should know the information is incomplete or inaccurate.'"

CAL. CIVIL CODE Section 1785.25 (a).

56.   A violation of *any* California statute provides the basis for a cause of

action under the California Business And Professions Code Section 17200,

according to Chabner v. United of Omaha Life Ins. Co., 225 F. 3d 1042, 1048 (9th

Cir. 2000) in support ("the district court was correct in holding that Chabner could

maintain a cause of action under section 17200 for United's alleged violation of

section 10144").

57.   Additionally, the bank's advertising of  the  property for foreclosure

sale to the public, to give the impression to the public that the bank had a right to

sell was a misleading advertising and constituted a "fraud on the public" under

common law, which provides a separate basis for a cause of action under the

California Unfair Competition Law which is set out in the California Business

And Professions Code Section 17200.   Bank of the West v. Superior Court, 2

Cal.4th 1254, 1262, 833 P. 2d 545 (1992) ("an act that is deceptive and in effect a fraud on the public or that otherwise violates the legal and equitable rights of a competitor or the public.").

58.   WELLS also violated this state law by continuing the fraudulent scheme of its acquired lenders World and Wachovia for which these lenders were sued on information and belief, by several states for refusing to fund loans and then declaring borrowers in default for failing to pay on those unfunded loans. The proof that WELLS was well aware of this illegal scheme of those acquired lenders World and Wachovia was that by late 2010 WELLS had acknowledged the illegal practices of World and Wachovia in settlement agreements to pay hundreds of millions of dollars to shorten law suits with regulators in Arizona, Colorado, Florida, Illinois, Nevada, Texas and Washington.

59.   Sister was forced to file bankruptcy after bankruptcy for years to prevent WELLS from trying to sell.

60.   The bank's refusal to stop this "bluff" after its own internal investigation admitted on March 8, 2016 at 8:11am in a FAX transmission by WELLS staffer Willie C. Johnson, at WELLS Fargo Home Lending at 1 Home Campus, Des Moines, Iowa, that the loan WELLS seeks to foreclose against was never funded, proves that the bank knew its representations to the public were misleading and intended them to be misleading.

61.   This repeated misleading advertising and reports to credit bureaus was an actual or proximate cause of the harm visited upon Sister described above at ¶¶ 48, 55.

62.   The allegations above at ¶¶ 48-55 show the advertisements and reports to credit bureaus and to others in the public by WELLS that plaintiff was in default, and failed to pay mortgage payments in 2017 or any prior year since 2011, were false.

63.   And it is not necessary to show the injury visited upon plaintiff was directly caused by the misleading business practice of WELLS, according to Saunders v. Superior Court, 27 Cal.App.4th 832, 839 (1994) (this law does not require that a plaintiff prove she was directly injured by the unfair business practice; only that the practice hurt the plaintiff in some way or could injure the public).

64.   Plaintiff has shown at ¶ 55 above that the misleading of WELLS was directly or indirectly the cause of her inability to complete loan contracts and to continue her business, and to avoid more serious medical problems.

65.   Under this California Act, exemplary damages and punitive damages are *not* available as they are under the state fraud action, and a plaintiff is only entitled to "restoration" damages, or the amount to compensate for personal or real property actually lost because of acts by the bank, according to Korea Supply Co.

v. Lockheed Martin Corp., 29 Cal.4th 1134, 63 P. 3d 937 (2003).

66.    WHEREFORE, Brother seeks and is entitled to an award of restitution against WELLS of $2 million that would restore to Brother his lost opportunity costs over that 9 year period since California law allows it, as in Vigilant Ins. Co. v. Chiu, 175 Cal. App. 4th 438, 441 (2009)(restitution includes lost opportunity costs).

67.    And Sister seeks and is entitled to another $2.2 million for the lost Archer St. house, plus her right to continue her real estate business which WELLS took from her for nine (9) years or $2.8 million, plus $375,000 for the value of the condo that the bank has reported to have sold on about March 4, 2019.


## III.

## THIRD CAUSE OF ACTION FOR RESCISSION
## UNDER THE TRUTH IN LENDING ACT

68.    Allegations above are incorporated into this claim by this reference.

69.    The loan transactions described at ¶4 above were entered into as consumer credit transactions with the lender World in which any credit extended was subject to a finance charge payable to World Savings and later to Wachovia and then to WELLS.

70.    Two credit agreements were actually contemplated, one for an initial

mortgage and the other for future advances as an "equity line of credit".

71.   Both deeds of trust that memorialize the credit agreements under a separate agreement, were governed by the latter deed of trust filed and recorded in the San Diego County Office of the Recorder in December 2007, and a copy of that credit agreement that was filed by World Savings is attached hereto.

72.   Brother does not represent that the attached is a true and correct copy of the final agreement; only that the attached copy is the one supplied by WELLS which WELLS admitted to California courts to be the final governing agreement. Therefore, WELLS is bound by ¶21 of the deed that states statutes of limitation are waived, under the rule in Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (admissions by party attorney constitute admissions by the client).

73.   As part of this transaction, WELLS purported to have retained a security interest in 2410 Albatross St., Unit 12, which is Sister's home, although Brother claims a superior materialman's lien on the same property.

74.   The security interest WELLS claimed, if valid, was not created to finance the acquisition or initial construction of the residence.

75.   This consumer credit transaction was subject to the borrower's right of rescission described by 15 U.S.C. § 1635 and Regulation Z §226.23.

76.   In the course of this transaction lender World violated 15 U.S.C. § 1635 and Regulation Z §226.23 by failing to deliver to Sister two copies of a

notice of a right to rescind that:

    a.  Identified the transaction;

    b.  Clearly and conspicuously disclosed the security interest in Sister's home;

    c.  Clearly and conspicuously disclosed Sister's right to rescind;

    d.  Clearly and conspicuously disclosed how to exercise the right to rescind the transaction, with a form for that purpose, designating the address of the lender's place of business;

    e.  Clearly and conspicuously disclosed the effects of rescission;

    f.  Clearly and conspicuously disclosed the date the right to rescind expires.

77.  WELLS and World also failed to provide a disclosure statement as required  by The Truth in Lending Act and Regulation Z and, therefore, hid the finance charge it was supposed to disclose under 15 U.S.C. § 1605 and §1638(a)(3) and Regulation Z §226.4 and §226.18(d).  The missing amounts include but are not limited to, (I) any broker fee, (ii) credit report fees, (iii) all recording fees, and (iv) any settlement fees.

78.  By improperly including all of these charges in the amount financed the defendant creditor failed to disclose the amount financed and this was a violation of 15 U.S.C. § 1638(a)(2)  and Regulation Z §226.18(d).

79.  The defendants also failed to disclose the correct annual percentage

rate (APR) and had the lender done so it would have been false because it did not

take into consideration all of the charges and this was a violation of 15 U.S.C. §

1638(a)(4) and Regulation Z §226.18 ( c).

80.   The disclosures as itemized above were material disclosures, as defined

by the Truth In Lending Act, 15 U.S.C. § 1602(n) and Regulation Z § 226.23 n.

48.

81.   The finance charge and APT were underdisclosed by more than the

tolerance levels set forth in 15 U.S.C. § 1605.

82.   By reason of those material violations, Sister had a right of rescission

for three years from the date of consummation of the loans, or from December 30,

2007, pursuant to 15 U.S.C. § 1635 (f).

83.   However, that three year deadline was eliminated by the parties by

express agreement at ¶ 21 in the deed of trust, wherein the lender waived the right

to assert statutes of limitation as a defense and this waiver applies in the context of

Truth In Lending law suits, since California law and courts allow such waivers.

Dexter v. Pierson,  214 Cal. 247, 250-251 (1931) (mortgagor and lender may

expressly waive the statutes of limitation defense in their mortgage contracts);

Kerby v. Mortgage Funding Corp, 992 F.Supp. 787, 792 [2], [3], 795 (D. Md.

1998) (waivers by the gov't are strictly construed but waivers of statutes of

limitation by private parties over RESPA and TILA are liberally construed so

equitable tolling is available).

84.   Therefore, this action for rescission under the Truth In Lending Act is timely.

85.   Or, if it is not timely, on about June 1, 2018 Sister propounded a new formal notice of rescission to WELLS and WELLS ignored it, failing to respond in any way in the 20 days the statute requires for a response.   Even if the original 2010 deadline for suit is not construed as waived by this court for any reason, that 2018 notice of rescission restarted the time within which to sue so this action is timely.

86.   WELLS also purports to have sold the property on about March 4, 2019,  and if the sale were *bona fide*, it would have extinguished the right to sue for  rescission on this Act under the rule in Mehta v. Wells  Fargo Bank N.A., 737 F.Supp.2d 1185, 1192 (S.D. Cal. 2010)(sale is absolute bar to rescission), and Takushi v. BAC Home Loans Servicing, LP, 814 F.Supp.2d 1073, 1081 (D. Haw. 2011) (rescission right extinguished where lender sold the property).

87.   However, that rule extinguishing the right to rescind does not apply if the lender had no authority to sell, as in In re Gassaway, 28 B.R. 842, 848 (Bankr. N.D. Miss. 1983)(right of rescission under TILA was exercisable by trustee and not terminated by foreclosure sale where that sale was null and void as taken in violation of the automatic stay).

88.   Because the lenders provided no consideration for the loan transactions (did not fund the loans), the deed of trust they acted under was null and void and they had no authority to sell based on a blank paper, *so there was no sale* on March 4, 2019.  It was only a sham.  Eitel v. Schmidlapp, 459 F. 2d 609, 612 at II (4th Cir. 1972) (A sale of land done without the authority required for the sale is "not a bona fide sale at all"); OC Interior Services, LLC v. Nationstar Mortgage, LLC,  7 Cal. App. 5th 1318, 1331-32 (2017) ("An instrument that is void ab initio is comparable to a blank piece of paper and so necessarily derives no validity from the mere fact that it is recorded."); Heights Props. 1388 LLC v. Make Realty Corp., 506401/2013,  2014 NY Slip Op 51755 at Discussion (King's Cty.   Dec. 15, 2014) (The contract of sale was not a sale, because it was not agreed-to by the corporation officers who had the authority to sell).

89.   And even a county-issued grant deed is not proof that the sale was valid were there was no *bona fide* sale.  Peterson v. Wells Fargo Bank, NA, 236 Cal. App. 4th 844, 854 (2015) (trust deed is not a sale even if it purports to convey property, and grant deed submitted as proof of sale is null and void).

90.   Therefore, Sister has a right to ask a jury to determine that there was no sale of the subject property.  Gold'n Plump Poultry, Inc. v. Simmons Eng. Co., 805 F. 2d 1312  (8th Cir. 1986) ("Whether or not a sale occurred is a question of fact for the trial court.").

91.   If the jury finds there was no sale, then the time to rescind re-started on June 1, 2018 and Sister or Brother have 3 years from that date to file this cause of action, and the court must hold that the bank's failure to respond to the notice of rescission  cancelled the loan even if the loan were valid.

92.   WHEREFORE, plaintiffs seek and are entitled to these remedies according to statute against the assignee bank WELLS, since the missing parts were apparent "on the face of the document" by virtue of the fact that there are no documents in the loan file to suggests these missing papers were given to Sister.

93.   These statutory remedies are the following:

a.   Rescission of the loans.

b.   Termination of any security interest in Sister's home.

c.   Return of all money submitted by Sister to the lenders.

d.   Damages of $2,000 for disclosure violations.

e.   Damages of $2,000 for the failure to respond to the rescission notice.

f.   Forfeiture of return of any loan proceeds proven by WELLS.

g.   Actual damages proven at trial.

h.   Attorney's fees.

15 U.S.C. §§ 1635 (a), 1640 (a), 1641( c), and Reg. Z.

## IV.

## FOURTH CAUSE OF ACTION FOR RESCISSION OF SALE

## UNDER CAL CIV. CODE § 2924h(g)

94.   The allegations above are incorporated into this claim by this reference.

95.   CAL CIV. CODE § 2924h(g) allows an owner of property or a lienor on that property to rescind a foreclosure sale by the mortgage holder on the grounds that the sale was not *bona fide*, if the trustee executing the sale conspired with the beneficiary lender to offer the property for sale after insufficient notice to the public of sale so that few potential bidders were present to offer a full fair market value of the property, according to U.S. v. Countrywide Home Loans, Inc. , 408 F. App'x 3, 6 (9th Cir. 2010) ("because defendants are not bona fide purchasers, Countrywide retains a valid lien on the home").

96.   This is a criminal statute that is allowed as a basis for a civil claim:

CAL. CIVIL CODE section 2924h, subdivision (g) provides that it is unlawful for any person, acting alone or in concert with others, (1) to offer to accept or accept from another, any consideration of any type not to bid, or (2) to fix or restrain bidding in any manner, at a sale of property conducted pursuant to a power of sale in a deed of trust or mortgage.... [¶] In addition to any other remedies, any person committing any act declared unlawful by this subdivision or any act which would operate as a fraud or deceit upon any beneficiary, trustor, or junior lienor shall, upon conviction, be fined not more than [$10,000] or imprisoned in the county jail. [T]he trustee, which was also a beneficiary under a deed of trust, conspired "to conduct the sale in a manner calculated to `chill the bidding' and [to] permit [it] to purchase the property at lower

than market value and to cause [the junior lien holder] to lose its
security interest."   South Bay, as a junior lienholder, clearly falls
with the class for whose benefit the statute was enacted and therefore
may use defendants' violation of the statute to establish civil liability.

South Bay v. Riviera Lend-Lease, Inc., 85 Cal. Rptr. 2d 647, 658 (1999).

97.   That is what happened on March 4, 2019: CLEAR  RECON advertised

the sale date days before March 4, 2019 to prevent a full house of bidders to

appear and this allowed WELLSto take the property at a price that was insufficient

to compensate Brother's superior lien on the same property.

98.   The conspirators, WELLS and RECON also failed to inform Brother of

the sale date, knowing Brother had or claimed a lien superior to that of the lenders

here.

99.   Brother's lien came about because he did construction work on the

home in 1974 at 1132 Archer St. establishing an automatic lien enforced as a

mortgage for the value of that unpaid work in 1974 pursuant to California

Constitution, Article XIV, § 3.

100.   That property was later formally mortgaged without Brother's

knowledge, providing funds to pay for the properties at 2410 Albatross St. #12, at

issue here.  In other words, the loan at issue in this action was not used to pay for

the purchase of this property at Albatross.   Instead, the loan for the Archer St.,

was used, in part, to pay for the purchase of the property at Albatross long before

the World agreement for Albatross.

101.  That use of Archer St. money on which Brother had a lien, transferred Brother's lien to the Albatross property under the doctrine of tracing, creating a secured mortgage as "first in time" against Albatross in the 1st position, ahead of the lenders in 2007, because Brother's lien started in 1974.  In re El Dorado Imp. Corp., 335 F.3d 835 (9th Cir. 2003)(under California law a holder of a mechanics lien has priority over general creditors and also over any security interest that came after the work on debtor's property began).

102.  Brother filed a proof of claim against the Albatross house on about February 18, 2018, on these bases, claiming $85,000 to $400,000 as a first priority lien superior to that of WELLS, in the bankruptcy court in In re Bauman, 17-06250 (S.D. Cal. 2017), and no party objected to it, and WELLS was a party in that action and also did not object to it.  That bankruptcy judge ruled that failure of a formal objection to a claim allows the claim as valid.   So Brother's claim was valid and in first priority over any interest WELLS claimed.

103.  Therefore, if the WELLS loan is valid, Brother's lien against the Albatross house was ahead of that lien in priority and WELLS had a duty to inform Brother of a planned sale and WELLS and its trustee RECON violated CAL CIV. CODE § 2924h by setting the sale date in a way to prevent other bidders from attending to prevent a full market value sale and to allow Brother to be paid his full lien first.

34

104.   WHEREFORE, Brother seeks and is entitled to a ruling setting-aside the sale *if* it is a sale, because of Brother's superior lien, under CAL CIV. CODE § 2924h(g).

**V.**

**FIFTH CAUSE OF ACTION FOR CONVERSION**

105.   The allegations above are incorporated into this claim by this reference.

106.   A plaintiff proves conversion by alleging and showing evidence of "any act of dominion wrongfully exerted over another's personal property", and harm to the owner or person with the superior right over the property.  Fischer v. Machado, 50 Cal.App.4th. 1069, 1973 (1996), Burlesci v. Peterson, 68 Cal.App.4th 1062, 1065 (1998).

107.   Both defendants committed conversion in two ways.

108.   The first way they committed conversion was by blocking Brother and Sister's use of the property for 9 years with a Slander of Title, as from 2011 by making false claims of foreclosure rights on the property which prevented Brother and Sister from mortgaging the property to make payments on and saving the $2.2 million Archer house, and to do other things with the money like paying condo dues to avoid harassment and stress and law suits from the homeowners

association for Albatross, and rebuilding Sister's real estate business.

109.   The second way they committed conversion was by purporting to sell the property in 2019 when they had no such right because there was no valid loan agreement, so RECON had no right to sell which a *valid* deed of trust night permit. That committed conversion by exercising a right of sale that belonged only to Brother or Sister and taking the money from the sale to give to the company pursuing this bluff, WELLS, and then giving that same money back to WELLS. Gherman v. Colburn, 72 Cal.App.3d 544, 568 (1977)  (Although there is no tort of conversion of real property in California, the right to sell and take the proceeds are personal property and may be the basis of a conversion claim against a seller of the real property who had no right to take the money from the sale).

110.   WELLS then committed conversion by supposedly "buying" the property it had no right to take because the owner (Sister) and the claimed lienor (Brother) had no desire to sell.  Regent Alliance Ltd. v. Rabizadeh, 231 Cal.App.4th 1177, 1182 (2014) (innocent purchasers of converted goods may be liable for conversion when they took the property from another converter, following Witkin: "an innocent buyer from one without title of right to sell is ordinarily liable for conversion").

111.   Brother and/or Sister were harmed by the loss of control of the property from 2011 to 2020 and the economic harm it caused Sister and Brother

during that period as described in ¶¶ 48-55 above, and by the emotional stress and physical injuries visited upon Brother and Sister more fully described in the causes of action for emotional distress below.    Additionally, because the sham sale of March 4, 2019 was not a sale at all, the law suit against Brother and Sister for eviction now before the California Superior Court is an act of conversion because WELLS has no right to pretend they own the property, and Sister's notice of rescission delivered on about July 12, 2019 by itself created a rescission of the mortgage contract with WELLS without any ruling by any court, according to Jesinoski v. Countrywide Home Loans, Inc., 574 US 259, 135 S. Ct. 790 (2015) (merely serving the notice of rescission creates the rescission).

112.   This "blocking" of the rights of Brother and Sister to take their desired actions was an actual or proximate cause of the harm described above.

113.   The cost of that emotional distress is expressly allowed as a jury award for damages under California law at Gonzalez v. Personal Storage, Inc., 56 Cal.App. 4th 464, 475-479 (1997)(if conversion of property is the legal cause of the harm to the plaintiff, damages may be allowed for that harm, even if the conversion only humiliates plaintiff and the defendant should have realized that emotional distress would follow).

114.   And a jury award of punitive damages is also permitted according to In re Brian S., 130 Cal.App.3d 523, 530 (1982).

115.   WHEREFORE, Sister claims for conversion for the period 2011 to 2020 and is entitled to $3 million in actual and consequential damages against each defendant, related to Sister's *economic* losses from her real property, and $10.9 *billion* in punitive damages.   And Brother claims for conversion for the same period $2 million in lost opportunity costs and $2 *billion* in punitive damages.

116.   And Brother on his own behalf as lienor for the same property for the period 2018-2019 leading to the purported sale seeks and is entitled to $400,000 for the value of his lien, and $100,000 for emotional distress to Brother alone.

# VI.

## SIXTH CAUSE OF ACTION FOR INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS TO BROTHER

117.   The allegations above are incorporated into this claim by this reference.

118.   The jury may award damages for this cause of action when the plaintiff proves (a) severe emotional injury, (b) caused by defendant's outrageous conduct, ( c) without privilege by the defendant, (d) intending to cause or with reckless  disregard for the probability of causing emotional distress, according to

Huntingdon Life Sciences v. Stop Huntingdon Animal Cruelty USA, 129

Cal.App.4th. 1228 (2005).

119.   As for (a)  The severe emotional distress visited upon Brother was his

involuntary reaction to his Sister's deteriorating mental, emotional, and physical

condition watching his Sister's painful slide into paralysis, stroke, coma, and near

death as a result of the "bluff" of these defendants pursuing this property

ruthlessly year after year from one bankruptcy to another, until Brother was finally

hospitalized in 2018, in part from the break-down of his own body functions

worrying about his Sister's deteriorating condition.

120.   A Brother has standing to sue for his own distress that he suffered in

California from the harm visited upon his Sister under the rule in Thing v.

LaChusa, 48 Cal.3d 644, 663-664 (1989)(emotional distress to relative at a

distance from the actual injury states a claim).

121.   The deadline within which to sue is two years after the date that the

stress  took effect in California to seriously harm the plaintiff, according to

Holiday v. Jones, 215 Cal.App.3d 102, 120 (1989).

122.   As for (b), the actions to throttle and punish Sister by the defendants

were an actual or proximate cause of Brother's distress starting in late 2017, for

which Brother gave notice to defendants as a part of the adversary action he filed

in the  bankruptcy court in February 2018, but which the bankruptcy judge would

not permit to be formally served and prosecuted because the judge was preparing

to  end that bankruptcy or lift the stay so Brother and Sister could bring the same

claims in courts outside of bankruptcy, which the judge did in May 2018.

123.   Behavior may be considered outrageous if a defendant 1) abuses a

relation or position which gives him power to damage the plaintiff's interest; 2)

knows the plaintiff is susceptible to injuries through mental distress; or 3) acts

intentionally or unreasonably with the recognition that the acts are likely to result

in illness through mental distress. <u>Newby v. Alto Riviera Apartments</u>, 60 Cal.

App. 3d 288, 297 (1976).

124.   Courts have ruled the position of creditor over the plaintiff by itself

creates a power to harm in this way which the creditor abuses by unlawful

collection actions, in <u>Bundren v. Superior Court</u>, 145 Cal. App. 3d 784 (1983), and

a  California appeals court has ruled that a jury may find outrageous conduct if the

defendant knew at the time the actions were committed that the plaintiff was

suffering from them.   <u>Cochran v. Cochran</u>, 65 Cal. App. 4th 488, 494 (1998).

125.   Defendants knew Brother and Sister both were susceptible to injuries

through mental distress caused by these defendants because Sister told them so

during her multiple bankruptcies and Brother told them so in an adversary

complaint submitted to them in February 2018.   Therefore the defendants' acts

were outrageous.

126.   Brother finally sought medical attention in 2018 in three hospitals in part, because of emotional distress, and has been on medication ever since then.

127.   Although there were additional causes for the total emotional distress experienced by Brother in 2018 including a car accident in late 2018 that ended Brother's ability to work, the stress created by these defendants need not be the sole cause of the harm to Brother during this period and a jury may still allow a full award of damages that it believes is warranted by the actions of these defendants.   Scirex Corp. v. Federal Ins. Co., 313 F.3d 841,  849-50 (3d Cir. 2002)(the direct cause of a loss "does not have to be the sole cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be a proximate or substantial cause" of the loss to allow a damages award).

128.   As for ( c), the defendants had no lawful excuse or privilege for continuing to threaten Sister's home and imposing stress on Sister that hurt her medically because they had no right to commit fraud on the public by pretending they had powers to act under the deed of trust.   Therefore, they had no privilege to harm Brother with the same conduct either.

129.   As for (d), the defendants intended to hurt Sister with constant threats of  foreclosure and eviction, intending Sister to die to get her out of the way so they could take her property.   And they demonstrated reckless disregard for the stress caused to Brother after Brother informed them in the 2018 bankruptcy

action he was being hurt.

130.   The sham sale of March 4, 2019 only aggravated Brother's stress-based injuries.   When this complaint was drafted in 2018 Brother was informed he may die within a few years because the stress is killing him and he will need several organ transplants to survive.   He has been attached to a medical device 24 hours a day for over a year, takes medications to stay alive, and visits medical providers several times every week, to try to reverse some of the damage caused by these defendants attacking his sister.   He had none of these problems before the trauma visited upon Sister by these defendants.   Their threats to his sister's life are the actual or proximate cause of these injuries.

131.   As a result, Brother has lost all of 2019 and 2020 is unable to work because he is connected to a medical device and has stress and sleeping problems related to the stress, and has had to undergo two years of pain and suffering from the stress separate from medical costs.   A jury in California where the injuries started, could award these losses as compensatory damages according to CAL. CIV. CODE §3333.   Therefore, a jury in South Dakota may do the same.

132.   Additionally, these facts show malice by the defendants for deliberately continuing the scam after 2016 when the bank's own investigation revealed there was no loan money given to Sister to begin with so the bank gave no consideration and had no power to demand anything and no legal justification

42

for causing distress of any kind.

133.   In fact, it is even more clear that these defendants had malice in wrongfully advertising foreclosure to seize Sister's home after 2016 because in the bankruptcy In re Bauman, 16-301 (Bankr. S.D. Cal. 2016), the judge set a date for claimants to file proofs of claim on June 3, 2016, which was 90 days after the first date set for the Section 341 trustee's meeting with the debtor-Sister.  But WELLS missed that  date, and did not file their (fake) proof of claim until July 2016.

134.   As a matter of law, missing that deadline that had the effect of extinguishing all secured claims of WELLS against the Albatross property if there were any, under cases cited by the bankruptcy court itself in Perry v. Certificate Holders of Thrift Savings, 320 F.2d 584, 589 (9th Cir. 1963) ("a claim must be proved within a fixed time and that if not so proved, it may not be allowed") and In re Prestige Ltd. Partnership- Concord, 234 F. 3d 1108, 1118 (9th Cir. 2000) ("[U]nder Rule 3002(c)(3) a  previously secured creditor who did not file a secured claim may file an unsecured claim . . .. East Bay's security interest was deemed waived").

135.   Therefore, as of June 3, 2016 WELLS was only an unsecured claimant with no right to foreclose or sell anything, but continued to act as if they were a full secured creditor, and continued to demand the Albatross property by foreclosure notice in October 2017 without standing to do so, thereby starting a

dangerous emotional turmoil for Sister and Brother which sent Sister to the doctor,

and forced a new filing of bankruptcy by Sister on October 16, 2017.

136.   So, WELLS knew there was no loan since inception, and WELLS

knew its own investigation proved no loan was worked and no check was made,

and WELLS *knew* if it had any secured claim that claim was extinguished in June

2016 in the bankruptcy court.   But they persisted in their bluff anyway, knowing

the stress was killing Sister and hurting her Brother, this plaintiff.   That is malice.

137.   Therefore, a jury may award punitive damages as well, which need

not be based on the actual medical costs, but on a percentage of the fair market

value of the corporations as a punishment factor, according to CAL. CIV. CODE

§3294 and Slaughter v. Legal Process & Courier Service, 162 Cal. App. 3d 1236,

1252 (1984) (punitive damages are recoverable on showing of malice ).

138.   WHEREFORE, Brother seeks on his own behalf and is entitled to

$1.9 million in damages for lost time and pain and suffering, and $10.9 *billion* in

exemplary or punitive damages based on 1% of the net worth of WELLS as one of

the largest banks in the world with $1.9 trillion in assets, under the California rule

from the San Diego appeals court in Devlin v. Kearny Mesa AMC/Jeep/Renault,

Inc., 155 Cal. App. 3d 381, 391 (1984)("Net worth generally is considered the best

measure of a defendant's "wealth" for purposes of assessing punitive damages . . ..

Although the award, representing 17.5 percent of Kearny Mesa's annualized net

worth or almost 4 months net profit, is somewhat greater than comparable ratios

contained in the reported cases . . . we cannot say these numerical differences

mandate a finding of excessiveness".).

## VII.

### SEVENTH CAUSE OF ACTION FOR DAMAGES

### FOR COMMON LAW CREDIT DEFAMATION

139.   Allegations in prior claims are incorporated herein by this reference.

140.   Plaintiff Bauman filed bankruptcy on about July 5, 2011 to prevent

adverse credit reports of failures to pay by WELLS and to stop a potential

foreclosure threatened by WELLS, and to collect and protect her assets from her

former husband, and she repeated the requests and reported in her bankruptcy

schedules and proposed plan that the WELLS account record was in error on the

basis that it showed all proceeds were funded when debtor could not produce

proof of full funding.

141.   Because plaintiff made multiple calls to WELLS, and because debtor

filed a bankruptcy, WELLS retaliated against debtor to punish her They executed

this punishment in three ways.

142. First, WELLS refused to entertain seriously her requests for

modification of a loan and refused to give her a copy of her own payment history,

knowing that she could not submit a serious package for a loan with a different lender without getting the record from WELLS, while she was entitled to a modification under the law, under In re Mason, 315 B.R. 759 (Bankr. N.D. Cal. 2004) (debtor is entitled to a modification if the inability to make current payments is not his fault).

143.   Second, although WELLS knew debtor was protected by the bankruptcy stay and had no duty to make payments because of that bankruptcy stay, WELLS still made derogatory reports to credit bureaus deliberately with wilful intent to hurt debtor that she was late on her mortgage payments for as long as 150 days while the stay was in force.

144.   Defendant RECON acting in concert and cooperation with WELLS made approximately 37 monthly false reports that Plaintiff Bauman had a duty to make monthly mortgage payments when they knew that was not true.

145.   Those notices sent month after month had the effect of damaging her credit worse than a report of a bankruptcy, and this allows a jury to find WELLS guilty of credit defamation, as in Barton v. Ocwen Loan Servicing LLC.,  Civil No. 12–162 at * 8 (D. Minn. Sept. 26, 2012) (mortgage servicer reporting to credit agency that debt payment was due when it was not due because of bankruptcy, and that the report was done with malice or willful intent to injure such consumer, states a claim for credit defamation).

146. This included the period from September 2012 to August 2013, when the bankruptcy judge ordered the bankruptcy dismissed, but the plaintiff moved for stay pending appeal and the appeals court voided the dismissal and ruled in August 2013 that the bankruptcy was never dismissed, in the order at Bauman & Marin v. Billingslea, 12-cv-2476 (S.D. Cal. Aug. 30, 2013).

147. That made WELLS guilty of falsely reporting missed payments and WELLS knew or should have known the appeal could retroactively establish the bankruptcy stay, which is what happened here.

148. Additionally, WELLS may not plead good faith belief that the bankruptcy was over during that period because they knew the appeal was ongoing and that they were hurting the plaintiff's ability to re-start her real estate business, as in In re Pace, 67 F.3d 187, 191 (9th Cir. 1995)(willful violation includes intentional actions to interfere with a debtor during a bankruptcy, and a good faith belief does not prevent the finding of willful.).

149. Moreover, WELLS has no defense to continuing to allow that false reporting to remain in debtor's credit history after August 2013 when the district court vacated the bankruptcy dismissal and lift-stay from September 2012.

150. That refusal to correct the error that has now been published hundreds of times over the past several years constitutes a separate and distinct cause of action from the original mistake as in Franchise Tax Bd. v. Roberts (In re

Roberts), 175 B.R. 339, 343 (B.A.P. 9th Cir. 1994) (refusal to correct errors made

to property seized during a prior ignorance of the stay, is itself a deliberate and

new violation).

151. Because of these deliberately made false reports and the refusal to

correct them for over three years, debtor was seriously hurt in the following ways:

(a) She was unable to modify her loan with WELLS, or to interest any other lender

to refinance to protect her residence at Albatross or to allow her to make payments

to her Home Owner's Association, creating a constant threat of eviction and

foreclosure and stress;

(b) Debtor and husband were unable to show the required payment history to

refinance their mortgage administered by Chase Bank on their marital residence at

1132 Archer St., resulting in the complete loss of that property by foreclosure and

debtor's $800,000 equity;

( c) Debtor and husband were unable to use a refinance of the condo at Albatross

to make payments for Archer St., while the Archer St. loan applications were

processed, under the lost opportunity cost doctrine in Meyer v. Sprint Spectrum

LP (2009) 45 Cal. 4th 634, 640 n. 1 (2009)(lost opportunity cost as other uses

foregone is a proper method of assessing damages claimed);

(d) The threat of loss of the marital home at Archer St. compelled husband to file a

separate bankruptcy to protect that house, but WELLS continued the retaliation on

husband's filing by unlawfully freezing all of the accounts of debtor and husband so that they could not pay for anything anymore, neither mortgage payments nor credit cards, nor transportation, nor food, thereby forcing them both to miss monthly payments and incur adverse credit reports solely because of the freeze and not because of any failure on their part, making it even harder to get a loan for anything;

(e) The inability to execute a workable refinance plan, and the loss of daily essentials and even food, left debtor in a state of extreme poverty or destitution, severe emotional distress, near-death medical complications, denials of electricity and heat, threats and dunning notices from her Albatross residence were she was holed-up, like a leper to prevent service of eviction notices by the Home Owner Association, and complete misery;

(f) That poverty denied debtor nourishment she needed to stay healthy, denied her timely medical care she needed to stay as healthy as possible, caused extreme stress and a worsening of her condition which led to aneurysm or strokes, a half-dozen other serious surgeries, and a crippling struggle just to stay alive.

152.   This failure and refusal to respond as required was an actual and proximate cause of the losses described herein and entitles plaintiff to actual damages sustained as a result of the refusal, which include all those damages described herein.

153.   Because the acts of these defendants as described above included adverse reports of failure to pay when the plaintiff had no duty to pay during bankruptcy, and because those adverse reports ruined plaintiff's ability to reorganize her real estate business and refinance and save her properties and forced her into bankruptcy courts for over six years, and because the defendants knew that the bankruptcy stay was protecting her and did not ask for permission to make the adverse reports, those reports were deliberate and malicious.

154.   This entitles debtor to an award to compensate debtor for these same losses.

155.   WHEREFORE, plaintiff seeks and is entitled to a declaratory judgment that WELLS committed credit defamation against the plaintiff, and a jury award against each defendant named in this complaint, for $10 million for lost opportunity for her real estate business, emotional distress, personal injuries, lost years of her life she can never recover suffering in fear during multiple bankruptcies, and pain and suffering.

156.   MOREOVER, because the defendants' conduct was willful and the injuries intentional and malicious, plaintiff seeks and is entitled to an award of punitive damages as a jury may allow based not on the harm to plaintiff, but on a percentage of the value of the WELLS company which is $1.9 trillion.

## VIII.

## EIGHTH CAUSE OF ACTION FOR DAMAGES

## FOR  EMOTIONAL DISTRESS AND PERSONAL INJURY

157.   All allegations above are incorporated into this cause by this reference.

158.   Plaintiff Bauman was disabled from a physical trauma in a car suffered more than a decade ago, and has a fragile constitution.

159.   Because of this, while bankruptcy law was created to stop collection threats by creditors to avoid mental and physical distress from being forced to defend oneself while also recovering from severe financial difficulties, it was especially hard on this plaintiff because of her additional weak physical condition after repeated surgeries.

160.   These defendants were informed of this.

161.   After knowing this, the defendants intended to hurt plaintiff to punish her for filing bankruptcies, and intended to instill such stress that it would kill her so that they could take her house without objection, or they acted with reckless disregard for that result.

162.   Their campaign to hurt plaintiff was outrageous and without privilege from the start of their refusal to take further payments, and including the reporting of failures to pay mortgage payments during an active bankruptcy when no debtor

has a duty to make payments to any creditor.

163.   In bankruptcy court plaintiff was ordered for hearings time and again, and when she could walk and appear she brought medical records substantiating her serious physical problems and the Superior Court's designation of disability, to compel the judges to give her extra time to recover from the trauma of each court appearance.

164.   After the adverse creditor reports and notices of foreclosure by both of these defendants, plaintiff suffered such extreme emotional distress that she was hospitalized for bleeding in the brain (stroke). exhaustion, and paralysis.

165.   Almost every other day in 2014 and 2016 this same trauma forced plaintiff into a doctor's office or a hospital emergency room, to relieve stress and to avoid further internal bleeding. And from 2011 to 2017, the plaintiff was denied the ability and right to live normally, or without drugs and treatments. Essentially 100% of her waking time was spent trying to get WELLS to obey the contract they made and accept payments, and then protecting her home from foreclosure, and then medical treatments following collapse and stroke. Her life has been worse than in a prison camp, threatened with death almost every day because of the malicious conduct of these defendants.

166.   The conduct of these defendants as described above was a proximate cause of these injuries.

167.   Although some of these injuries commenced in 2014 and some new injuries in 2016 and some new injuries in 2017, all statutes of limitation for these claims were tolled until 2018 by virtue of Sister's filing of these claims in the bankruptcy court in 2016 and 2017 which transferred the right to prosecute them to the bankruptcy trustee, according to In re Corbett, Adv. No. 14-01089 (Bankr. E.D. Cal.  March 14, 2016)-A  ("personal-injury causes of action **are property of the estate**" so debtor may not pursue her own claims for personal injury), and because Sister sought leave from the bankruptcy trustee to prosecute these claims outside of the bankruptcy and it was denied.

168.   The Supreme Court of the United States has also ruled that the loss of time resulting from having to defend against violations of the law by itself is a measure of compensatory damages that a jury may award to the victim, in Heck v. Humphrey,  512 U.S. 477, 114 S.Ct. 2364 [7] (1994).

169.   And the illegal conduct of these defendants was an actual or proximate cause of the loss of this employment opportunity and the loss of her emotional stability.

170.   And even in the presence of other stress and other difficulty, like the actions of other creditors to threaten plaintiff, a jury is still entitled to find the actions of these defendants were *still* a proximate cause of this harm if the jury agrees that the actions of these defendants were merely a "substantial cause" of her

injuries or loss of time, according to <u>Scirex Corp. v. Federal Ins. Co.</u>, 313 F.3d

841, 849-50 (3d Cir. 2002) (the direct cause of a loss "does not have to be the sole

cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be

a proximate or substantial cause" of the loss to allow a damages award).

171.   WHEREFORE, plaintiff seeks and is entitled to a declaratory

judgment that WELLS committed credit defamation against the plaintiff, and a

jury award against each defendant named in this complaint, for $10 million for lost

opportunity for her real estate business, emotional distress, personal injuries, lost

years of her life she can never recover suffering in fear during multiple

bankruptcies, and pain and suffering.

172.   MOREOVER, because the defendants' conduct was willful and the

injuries intentional and malicious, plaintiff seeks and is entitled to an award of

punitive damages as a jury may allow based on a percentage of the value of the

WELLS company which is $1.9 trillion, and all other relief the court deems just

and proper.

## IX.

## NINTH   CAUSE OF ACTION FOR

## FOR VIOLATION OF TILA, THE TRUTH IN LENDING ACT

173.   All allegations above are incorporated into this cause by this

reference.

174.   A homeowner states a claim under the TILA when she alleges and proves that the lender failed to disclose information required prior to completing the loan at issue, or failed to provide new information after the loan closes when the lender raises its interest rates.

175.   The original lender failed to make required disclosures as follows:

(a)   By failing to provide the required disclosures prior to consummation of the transaction in violation of 15 U.S.C. § 1638(b) and Regulation Z § 1026. l7(b) [formerly § 226.17(b);

(b)   By failing to make required disclosures, including the annual percentage rate and finance charge, clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 1026.17(a) [formerly § 226.17(a)];

( c)   By failing to properly identify property subject to a security interest in violation of 15 U.S.C. § 1638(a)(9) and Regulation Z § I026.18(m) [formerly § 226. I 8(m)];

(d)   By failing to include in the finance charge certain charges imposed by defendant payable by plaintiff incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z § 1026.4 [formerly § 226.4], thus improperly disclosing the finance charge in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z § 1026.18(d) [formerly

§ 226. 18(d)].

176. By reason of the aforesaid violations of the Act and Regulation Z, defendant is liable to plaintiff in the amount of twice the finance charge or $2000, whichever is less," actual damages to be established at trial," and attorney fees and costs in accordance with IS U.S.C. § 1640.

177. On about on about April 5, and 12 and 21, 2011 after WELLS acquired the lender plaintiff made WELLS aware that she had never actually received these papers and also never received the loan money agreed, and sought from WELLS a funding of that loan.

178. WELLS refused to answer.

179. Therefore, Plaintiff Bauman has a private right of action to force the production of those records and for damages and other relief as described above, according to 15 U.S.C. § 1640.

180. Once discovery demands in this court compel WELLS to deliver the required disclosures to Plaintiff Bauman, she will then have the right to unconditional rescission of the loan immediately thereafter, according to 15 U.S.C. § 1653 and as held in Watkins v. American Mortgage Associates, Inc., No. 4:09CV00835 SWW. at II, n. 2 (E.D. Ark. 2010).

181. Any applicable statutes of limitations were tolled for actions against WELLS for that failure for three reasons.

182.  First, the deed of trust cited above at ¶ 6 expressly bars the lender from asserting and relying on a statute of limitations defense.

183.  Second, on the filing of bankruptcy plaintiff's right to sue vested in the bankruptcy trustee so she had no right any longer to take action against the lenders.

184.  Third, plaintiff actually asked the bankruptcy trustee for the right to pursue claims against the lenders as are asserted here, and that trustee refused.

185.  Fourth, after the bankruptcies ended and the stay was lifted in 2018, Plaintiff Bauman filed a state court action against the lenders asserting these claims and that court dismissed all of them on statute of limitations grounds in 2019, and failed to reach the issue of the express waiver of the limitations defense that the lender agreed to in the deed-of-trust.   Plaintiff appealed that decision and that appeal is now in the California Supreme Court.

186.  Her state court action created equitable tolling that tolls claims when a party has several avenues and in good faith pursues one of them, and on a non-prejudicial dismissal the party may re-file in the federal court.   Zipes v. Trans World Airlines, Inc., 455 US 385, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling");

Attwood v. Mendicino Coast Dist Hosp., 886 F.2d 241 (9th Cir. 1989)("It may be

that in this particular case, the state proceedings, while proving inadequate to

resolve Attwood's claims, would toll the statute of limitations for her section 1983

action under California's doctrine of equitable tolling.").

187. That state court dismissal was non-prejudicial because it was based on

statutes of limitation. Jones v. Tracy School Dist., 27 Cal.3d 99, 108 (1980)(a

dismissal for statute of limitations is a dismissal for lack of jurisdiction)).

188. It was also non-prejudicial because in South Dakota the decision is not

considered final and binding until the highest state court rules and it may be

wholly disregarded if an action is filed here, as it was, before that highest court

rules.

189. Additionally, in the lender's deed-upon-sale of the property at issue

which WELLS provided to Plaintiff Bauman by surprise in a served eviction

notice in August 2019, WELLS listed a monetary claim indicating that they had

raised the interest rates drastically and illegally at some recent secret date near the

sham sale date although they were required to disclose this earlier and did not:

Motley v. Homecomings Financial, LLC, 557 F. Supp. 2d 1005 (2008)

("Regulation Z." Section 226.20(c)(4) requires a lender to disclose, among other

things, the loan balance when the interest rate changes on a variable-rate loan).

190. That delivery of the eviction notice with the inflated claim form

interest rate increases in August 2019 constituted a notice of an inflated loan balance as in <u>Motley v. Homecomings Financial, LLC</u>, 557 F. Supp. 2d 1005, at 1010 giving Plaintiff Bauman the right to commence a new action for violation of the TILA no matter what litigation occurred in the past.

191.  Therefore, the co-conspiring defendants violated both sections.

192.  Plaintiff Bauman was injured by this hide-and-go-seek conduct of the lenders because it was an actual and proximate cause of the emotional distress and physical injury visited upon her as described above.   Plaintiff Marin was injured similarly, because this was an actual and proximate cause of the stress visited upon him as described in his personal injury claims above.

193.  WHEREFORE, Plaintiff Bauman seeks and is entitled to a declaratory judgment that WELLS never had the right to inflate the loan balance because there was no loan money paid and, therefore, no consideration so no right to do anything, and that WELLS also violated these provisions and that entitles Ms. Bauman to a jury award against each defendant named in this complaint for $10 million for lost opportunity for her real estate business, emotional distress, personal injuries, lost years of her life she can never recover suffering in fear during multiple bankruptcies, and pain and suffering.

194.  Additionally, this outrageous 10 year game of fraud and cruelty of these defendants forced Plaintiff Bauman to file 16 actions and appeals to stop the

seizure and attempts to kill Bauman by emotional stress, all of which were

dismissed without prejudice to her substantive claims here for lack of jurisdiction.

But under California law the mere filing of 16 dismissed actions designates the

filer as vexatious and bars meaningful access to courts and appeals for the rest of

that litigant's life even if she was right all along and they were committing fraud.

195.  Worse yet, to make sure plaintiff suffered this loss at the hands of

WELLS they actually petitioned the California courts to designate Plaintiff

Bauman in 2020 as vexatious to make sure she lost her constitutional rights at

their hands and not by default under statute.

196.  This constituted a *de facto* denial of meaningful access to the 1st

Amendment right of access to courts since once placed into the dungeon of

vexation, no one gets out of that torture except by death, despite the provision that

allows escape since in practice the judges refuse to allow escape.

197.  THEREFORE, the defendants are liable as actual damages for the

value of the loss of Ms. Bauman's most cherished constitutional rights.   A jury

may make a substantial award for the loss of those rights regardless of actual

money costs to the injured plaintiff, as in Baker v. National State Bank, 353 N.J.

Super. 145, 165, 801 A.2d 1158, 1170 (2002)($1.8 million verdict for violation of

substantive due process rights upheld regardless of  the actual loss to plaintiff).

198.  Therefore, Plaintiff Bauman seeks and is entitled to $1 billion as the

value of the loss of *meaningful* access to her constitutional rights for the rest of her life or another amount that this jury finds is the worth the forced removal of constitutional rights for which Americans have died for 200 years.

199.   MOREOVER, because the defendants' conduct was willful and the injuries intentional and malicious, Plaintiff Bauman seeks and is entitled to an award of punitive damages of $10.9 *billion* or another amount as a jury may allow based on 1% of the value of the WELLS company which is $1.9 trillion, and all other relief the court deems just and proper.

200.   And brother seeks for the emotional distress against these defendants a damages award of $1.9 million in damages for lost time and pain and suffering, and $10.9 *billion* in exemplary or punitive damages based on 1% of the net worth of WELLS as one of the largest banks in the world with $1.9 trillion in assets, under the California rule from the San Diego appeals court in <u>Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.</u>, 155 Cal. App. 3d 381, 391 (1984)("Net worth generally is considered the best measure of a defendant's "wealth" for purposes of assessing punitive damages . . . .. Although the award, representing 17.5 percent of Kearny Mesa's annualized net worth or almost 4 months net profit, is somewhat greater than comparable ratios contained in the reported cases . . . we cannot say these numerical differences mandate a finding of excessiveness".).

201.   And they are also entitled to statutory damages because Section

1640(a) makes clear that statutory damages are available *in all cases*, according to

Dryden v. Lou Budke's Arrow Fin. Co., 661 F.2d 1186, 1191 (8th Cir.1981)

("TILA plaintiffs ... need not show that they sustained actual damages stemming

from the TILA violations before they may recover the statutory damages

provided.").

## X.

## TENTH CAUSE OF ACTION FOR RESCISSION

## UNDER THE RESPA,

## THE REAL ESTATE SETTLEMENT PROCEDURES ACT

202.  All allegations above are incorporated into this cause by this

reference.

203.  This consumer credit transaction was subject to Plaintiff Bauman's

right of rescission as described by 15 U.S.C. § 1635 and Regulation Z § 1026.23

(12 C.F.R. § 1026.23 [formerly § 226.23]).

204.  Plaintiff is a consumer within the meaning of 15 U.S.C. §1602(I) [§

1602(h) prior to Dodd-Frank amendments) and Regulation Z §1026.2(a)

(II) [formerly § 226.2(a).

205.  In the course of this consumer credit transaction, World and Wachovia

and, therefore, WELLS as acquiring bank, violated 15 U.S.C. § 1635(a) and

Regulation Z § 1026.23(b) [formerly § 226.23(b»] by failing to deliver to the

plaintiff two copies of a notice of the right to rescind at any time that:

(a) Identified the transaction.

(b) Clearly and conspicuously disclosed the security interest in the plaintiff's home.

( c) Clearly and conspicuously disclosed the plaintiff's right to rescind the transaction.

(d) Clearly and conspicuously disclosed how to exercise the right to rescind the transaction, with a form for that purpose, designating the address of the defendant's place of business.

(e) Clearly and conspicuously disclosed the effects of rescission.

(f) Clearly and conspicuously disclosed the date the rescission period expired.

206. By reason of those material violations of 15 U.S.C. § 1638, plaintiff has a right of rescission for three years from the date of consummation of the loan pursuant to 15 U.S.C. § 1635(f).

207. That deadline constitutes a statute of limitations and, because the lender agreed not to assert or rely on statutes of limitation as described in ¶ 6 above, Ms. Bauman still has that right to rescind today.

208. Alternatively, the statutes of limitation tolled only until the filing of bankruptcy under the mortgage contract, and on the filing of In re Bauman,

10-18930-PB7 (Bankr. S.D. Cal. Oct. 26, 2010) the loan then became an executory contract under the control of the bankruptcy trustee, and that action and subsequent bankruptcies that imposed the automatic bankruptcy stay further tolled the running of the three year rescission time to give notice of rescission in late 2018 when the bankruptcy finally lifted the stay.   The time to rescind then continued to run until Ms. Bauman gave signed written notice of her right to rescind in 2018, followed by another signed notice in 2019, a copy of which is attached hereto.

209.  Since the total expired time for the running of the right to rescind was less than three years, the notice of Ms. Bauman was timely.

210.  Defendants received copies of the Plaintiff's notice of rescission on or about July 14, 2019.

211.  More than 20 calendar days have passed since the Defendants received copies of the Plaintiff's notice of rescission.

212.  The Defendants have failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction, including the security interest described in Paragraph 8, as required by 15 U.S.C. § 1635(b) and Regulation Z § 1026.23(d)(2) [formerly § 226.23(d)(2)].

213.  Defendants have failed to return to the plaintiff any money

or property given by the plaintiff to anyone, including the defendants, as required by 15 U.S.C. § 1635(b) and Regulation Z § 1026.23(d)(2) [formerly § 226.23 (d)(2)].

214.  As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a), 1640(a), and 1641©, defendants are liable to plaintiff for:

(a) Rescission of this transaction.

(b) Termination of any security interest in Plaintiff's property created under the transaction.

( c) Return of any money or property given by the Plaintiff to anyone, including the Defendants, in connection with this transaction.

(d)  Statutory damages of $4,000 for the disclosure violations.

(e)  Statutory damages of $4,000 for Defendants' failure to respond properly to Plaintiff's rescission notice.

(f) Forfeiture of return of loan proceeds.

(g) Actual damages in an amount to be determined at trial.

(h) Reasonable costs of this action including reasonable attorney fee.

(l)  Award such other further relief as the Court deems just and proper.

215.  ADDITIONALLY, In the event the defendants demur on the basis that the right to rescission terminated on about March 4, 2019 with their purported sale

of the same property, Ms. Bauman seeks and is entitled to a declaratory judgment

finding that because no loan money was ever paid to Ms. Bauman, the lenders

acquired no rights under the deed-of-trust and, therefore, defendants had no right

to sell on March 4, 2019 so there was no sale, and they knew at the time they did

the sham sale that they had no right to sell ; it was a complete fraud.

216.  Therefore, the last notice of rescission of July 12, 2019 was timely and

valid to rescind the loan transaction without further act by Ms. Bauman, according

to Jesinoski v. Countrywide Home Loans, Inc., 574 US 259, 135 S. Ct. 790 (2015)

(merely serving the notice of rescission creates the rescission).

## XI.

## ELEVENTH  CAUSE  OF  ACTION  FOR  RESCISSION

## FOR  VIOLATION  OF  THE  "RESPA",

## THE  REAL  ESTATE  SETTLEMENT  PROCEDURES  ACT

217. All allegations above are incorporated into this cause by this reference.

218.  A homeowner may sue for violation of the Real Estate Settlement

Procedures Act (RESPA) when the lender fails to respond to a qualified written

request for information within 60 days.

219.  A signed original of the attached demand by Plaintiff Bauman was

delivered to WELLS on about July 12, 2019 which meets the definition of a

qualified request under 12 U.S.C. § 2605(e)(1)(B), and it was ignored, thereby

violating 12 U.S.C. § 2605(e), and entitling Ms. Bauman to a damages award under 12 U.S.C. § 2605(e)(2) based on "actual damages" under 12 U.S.C. § 2605(f)(1).

220.  WELLS did not supply any of the records sought because they do not have them because there was no loan and the sale on about March 4, 2019 was a sham sale, a fraud.

221. The actual damages she has sustained are the inability to execute an immediate rescission that she could have done under the TILA statute as described above and, therefore, she has now lost control of her property worth over $300,000, and she has incurred additional physical injuries moving from more emotional strain from defending against their unlawful eviction action in state court based on the 2019 sham sale.

222.  This additional strain was the actual and proximate cause of the new injuries visited upon Ms. Bauman.

223.  WHEREFORE, Plaintiff Bauman is entitled to A DECLARATORY JUDGMENT finding the security interest void *ab initio*, and to statutory damages as permitted by 12 U.S.C. § 2605(f)(1) because of the repeated refusal of WELLS to respond to such requests, and actual damages for the loss of control of the property  or $300,000 and for additional pain and suffering in the amount of $1 million for this cause of action alone.

# XII.

## TWELFTH CAUSE OF ACTION FOR RESCISSION AND DAMAGES FOR VIOLATION OF THE "HOEPA" HOME OWNERSHIP AND EQUITY PROTECTION ACT OF 1994

224. All allegations above are incorporated into this cause by this reference.

225. This is a cause of action brought by a low-income homeowner against a lender with whom she unknowingly entered into an exorbitantly priced mortgage loan. Plaintiff Bauman seeks rescission and statutory damages under the Home Ownership and Equity Protection Act of 1994 (hereinafter "HOEPA"), 15 U.S.C. §§ 1602(aa)53 and 1639, and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* and § 1640(a).

226. At all relevant times, the original lenders and the present acquiring lender WELLS regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed.

227. Plaintiff Bauman is a retired elderly homeowner who suffers from serious health problems.

228. Plaintiff owns the home at 2410 Albatross, Unit 12 in San Diego, which is her principal dwelling.

229. Until the transaction with these lenders the home was not subject to any mortgage.

230.  On or about July 9, 2007, plaintiff received a telephone call from World Savings asking if she was interested in a mortgage.  Plaintiff was hoping to re-start a business and needed money for it so she indicated that she was interested.

231.  On or about July 26, 2007 a representative visited plaintiff and had her sign an application for credit and deeds of trust.

232.  To qualify for the credit, the World loan officer required Ms. Bauman to start making monthly payments right away, before loan money was paid out, to prove she could make the monthly payments, and on the promise that after she had established a regular history of payments with World, the entire loan amount would be deposited to her account.

233.  On the date of settlement, plaintiff entered into a consumer credit transaction with World in which World agreed to extend consumer credit which was subject to a finance charge and which was initially payable to World, although World did not actually provide that credit at that time, holding it until Ms. Bauman proved she could make monthly payments.

234.  As part of this consumer credit transaction, World required Ms. Bauman to agree to give World a security interest, namely a mortgage, which is used as the principal dwelling of the plaintiff.

235.  At the time, plaintiffs' monthly income was minimal, and she had

high utility bills (exceeding $400 month), regular unreimbursed medical expenses of more than $150 per month and expensive dietary restrictions. Her total monthly payment she was making to World was $1,200 per month (the loan repayment amount, plus tax and insurance escrow), increased to $1,900 in the same first year without warning or explanation, and this became an amount in excess of her ability to pay.

236.  Pursuant to this transaction, plaintiff paid World and its acquiring bank Wachovia and its acquiring bank WELLS, $100,000 in payments, and she does not know what was applied to finance charges and fees or principal because WELLS refused to answer qualified written requests for that information.

237.  However, World never actually funded the loan, never sent Ms. Bauman one cent of loan proceeds while Ms. Bauman paid a total of about $100,000 in total payments from 2007 to 2011 "proving her self" to World, then Wachovia, then WELLS, and waiting for them to fund the loan.

238.  Because plaintiff paid $100,000 in points and fees effectively, and received no loan money at all, this was a high rate mortgage within the meaning of HOEPA, 15 U.S.C. § 1602(aa)(I)(B), in that the total "points and fees" as defined in that section exceeded 8 percent of the total loan amount of nothing.

239.  Upon information and belief, World extended credit to consumers under high rate mortgages, as defined by 15 U.S.C. § 1602(aa), based

on the consumer's collateral without regard to the consumers' repayment

ability, including their current and expected income, current obligations

and employment, in violation of 15 U.S.C. § 1639(h).

240. And in her case they did the same, but added the "pre-loan" payments

to consider her ability to repay.

241. Plaintiff believes and therefore avers that World required or induced

Ms. Bauman to borrow substantially more money than she was seeking, in order to

increase her monthly repayments and based primarily on World's evaluation of the

amount of equity in her home.

242. Because the transaction described herein met the HOEPA definition

of a high rate mortgage, the transaction was subject to additional disclosure

requirements that must be provided three days in advance of the

consummation of the transaction. 15 U.S.C. § 1639(b).

243. World did not furnish the required HOEPA disclosures to plaintiffs

three days prior to their settlement, it failed to make the disclosures regarding the

variable interest rate that are required by 15 U.S.C.. §1639(a)(2)(B).

244. The loan extended to plaintiff was, therefore, abusive, and includes

abusive terms prohibited including the prepayment of more than two payments

before the loan money was to be paid out.

245. World also failed to deliver all the "material" disclosures required

by the Truth in Lending Act to Plaintiffs in connection with this transaction as described above.

246.  World's agreement to lend to plaintiff based on collateral, without regard to their repayment ability in advance of payments being made, entitles plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a).

247.  World's failure to give plaintiff the disclosures required by HOEPA three days prior to settlement violates 15 U.S.C. § 1639(a) and (b), entitling plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a) and extending her right to rescind the transaction until up to three years after its consummation.

248.  World's inclusion of the abusive terms violated 15 U.S.C. § 1639, entitling plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a) and extending her right to rescind the transaction until up to three years after its consummation.

249.  WHEREFORE, Plaintiffs pray for the following relief, pursuant to 15 U.S.C. §§ 1635(a), 1639U), and 1640(a):

(a) Rescission of the transaction, including a declaration that the plaintiffs is not liable for any finance charges or other charges imposed by defendants;

(b) A declaration that the security interest in plaintiffs' property created under the transaction is void, and an order requiring defendants to release such

security interest;

( c) Return of any money or property given by the plaintiff to anyone, including the defendant, in connection with the transaction;

(d ) Statutory damages of $12,000 (consisting of $4,000 for the disclosure violation, $4,000 for the failure to rescind, and $4,000 for each prohibited term);

(e)  Additional damages pursuant to 15 U.S.C. § 1640(a)(4) in the amount of all finance charges and fees paid by plaintiff, for each non-disclosure violation;

(f)  An order finding that, because defendants failed to act in response to plaintiff's notice of rescission, plaintiff has no duty to tender the loan proceeds to defendants, but in the alternative, if tender is required, a determination of the amount of the tender obligation in light of all of the plaintiff's claims, and an order requiring the defendants to accept tender on reasonable terms and over a reasonable period of time;

(g) Actual damages in an amount to be determined at trial;

(h) An award of reasonable attorney fees and costs.


## VERIFICATION

I, Jordana Bauman, hereby state that I am a plaintiff in the matter filed herein; I drafted my claims in the preceding complaint and know the contents thereof and I testify that the facts stated therein are true and correct to the best of

my knowledge under the law of the State of California where I reside.

Executed this 22ND Day of June in San Diego CA 92101.

_____
Jordana Bauman


My allegations are hereby verified, under penalty of perjury under the laws

of the State of New York where I reside.

DATED:   June 22, 2020

_____
Mel  Marin

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Mel Marin, Jordana Bauman

## DEFENDANTS
Wells Fargo NA, Clear Recon Corporation

**(b)** County of Residence of First Listed Plaintiff  Oneida
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Hughes
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mel Marin, Box 710561, San Diego, CA 92171
Jordana Bauman, 415 Laurel St.  FRONT, PMB 440

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1331, 1337
Brief description of cause:
Emotional distress for defendants threatening and pursuing pursuing sham foreclosure

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 10,900,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions:)*  JUDGE  JLV  DOCKET NUMBER  19-cv-5057

DATE  JUNE 22 2020

SIGNATURE OF ATTORNEY OF RECORD
Jordna Bauman  *(signature)* Bauman, IN PROPER

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# FedEx
Express

Align top of FedEx Express® shipping label here.



```
ORIGIN ID:MYFA   (315) 737-1040      SHIP DATE: 24JUN20
MELVIN MARIN                         ACTWGT: 1.05 LB
808 OSWEGO ST                        CAD: 6991861/SSF02110
UTICA, NY 13502
UNITED STATES US
TO  US DISTRICT COURT OF S. DAKOTA
    OFFICE OF THE CLERK
    400 SOUTH PHILLIPS ROOM 128

    SIOUX FALLS SD 57104
    (605) 330-6600        REF:
    INV:
    PO:                   DEPT:
```

FedEx
Express

E

REL#
3785346

```
TRK#
0201  3941 9671 0983          MON – 29 JUN 4:30P
                              EXPRESS SAVER
```

**SY FSDA**          57104
                 SD-US  FSD



Handwritten label: RT 391 B 6 16:30 FZ 0983 06.26

Do not ship liquids, blood, or clinical specimens in this packaging

**FedEx** Express

## Extremely Urgent

**For FedEx Express® Shipments Only**

Contents should be compatible with the container and packed securely. For shipping terms and conditions and our limits of liability, refer to the applicable FedEx Express shipping document, the current FedEx Service Guide, or conditions of carriage.

For more information on FedEx Express services, solutions, and shipping locations, go to **fedex.com**, or contact your nearest FedEx location.

© 2018 FedEx 155475/155476 REV 3/18



See how FedEx connects the world in responsible and resourceful ways at **environment.fedex.com**. Join our efforts by recycling this FedEx envelope.

Insert shipping document here.